RENDERED: JUNE 15, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

## 2015-SC-000301-MR

DATE 7/6/17 Kim Redmon, DC

DARNELL SMITH          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.      HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
NO. 14-CR-000973

COMMONWEALTH OF KENTUCKY         APPELLEE

## OPINION OF THE COURT BY JUSTICE WRIGHT

### AFFIRMING

Darnell Smith was convicted of a number of offenses related to three separate robberies and sentenced to a total of 25 years in prison. In this matter-of-right appeal, he raises four claims of error: (1) that admitting his recorded statements to a detective violated his *Miranda* rights; (2) that barring him from introducing evidence of his refusal to sign a *Miranda*-waiver form prevented him from fully informing the jury of the circumstances surrounding his statements and thus infringed his right to present a complete defense; (3) that admitting evidence of a sweatshirt with no apparent connection to any of the charged offenses was reversible error; and (4) that denying his motion to sever the charged offenses for separate trials was reversible error. This Court affirms.

## I. BACKGROUND

Smith's convictions arose from three separate robberies committed in downtown Louisville in January 2014.

The first occurred on the evening of January 18. Wesley Kingsolving was waiting at a bus stop when two men asked him whether they should walk or take the bus to the Phoenix Hill Tavern (which happened to be very close to Kingsolving's apartment). He recommended the bus and volunteered to show them which stop to get off at because he lived across the street from the bar. So they all rode the bus and got off at the same stop. Kingsolving pointed out the bar before turning and heading home. But the two men did not go to the bar; they robbed Kingsolving instead. The robbers physically assaulted Kingsolving and forced him to let them into his apartment—there they stole a backpack, money, an Xbox, a laptop, condoms, and a cell phone. The lead assailant—the taller of the two men, whom Kingsolving would later identify through a police photo lineup and at trial as Smith—also threatened to shoot him with a "clip." After the robbers left, Kingsolving asked a neighbor to call 911. Surveillance cameras on the bus captured images of the men.

Thirty minutes later, the second robbery happened about one-and-a-half miles away, outside the Jewish Hospital campus downtown. There, two men approached a Jewish Hospital nurse, Joshua Worthington, who was outside on a smoke break. One of the men asked him for a cigarette, and Worthington declined. The man walked away but immediately returned and asked instead for a drag from the cigarette Worthington was then smoking. Worthington

again declined. The man punched him in the face, stole his cellphone, and ran away. Worthington never positively identified who struck him, but described his assailant as a black male who had "acne scars on his face" and was wearing a dark coat or jacket. (Smith has distinctive facial scars.) Surveillance cameras outside the hospital recorded the assault and captured images of the two assailants—their appearance matched that of the two suspects recorded on the bus surveillance before the Kingsolving robbery.

The third robbery occurred almost one week later, on January 24. That evening, Rodney Pino arrived in the parking lot of his apartment with his son and noticed two men standing in the lot. As he parked his car, one of the men approached and asked for a cigarette. Pino said, "Yes." But as he was exiting his vehicle, the man grabbed him. Pino tried to fight him off. During the struggle, according to Pino, the man implied that he had a gun and threatened, "You don't want it." Eventually, after Pino's son threw something at him, the attacker ordered his companion into Pino's car's driver seat. The attacker jumped into the passenger's seat, and they fled with the vehicle.

Patrol officers soon encountered the stolen vehicle on the road—the ensuing chase ended when the vehicle crashed. Smith exited from the passenger side of the crashed vehicle and briefly attempted to flee on foot before submitting to police. Law enforcement never apprehended the driver (and Smith never identified him, claiming that he hadn't known the man well and was unsure even of his name). Pino arrived at the scene a short time later and identified the handcuffed Smith as his attacker; he would identify Smith as

3

his attacker at trial as well. When police arrested him, Smith was wearing a dark jacket that appeared to be the same jacket that he was wearing in the bus and hospital surveillance footage from the earlier robberies.

Smith was charged with three counts of first-degree robbery, first-degree burglary, first-degree fleeing or evading police, two counts of third-degree terroristic threatening, and being a second-degree persistent felony offender (PFO).[1] (For all, he was charged with either principally committing or else being complicit in the commission of each offense. *See* KRS 502.020.) Before trial, he moved to sever the charges and have separate trials held for each of the three robberies; the trial court denied the motion.

After a three-day trial, the jury found Smith guilty of the three first-degree robbery counts, first-degree burglary, second-degree fleeing or evading police, both counts of third-degree terroristic threatening, and being a second-degree PFO. The trial court sentenced him to a total of 25 years' imprisonment as recommended by the jury.

Smith now appeals to this Court as a matter of right. *See* Ky. Const. § 110(2)(b). We will develop additional facts as needed in the discussion below.

---

[1] The Commonwealth also initially charged Smith with theft by unlawful taking over $500, which related to a separate incident involving Smith's then-girlfriend that is irrelevant to this appeal; as well as a third count of third-degree terroristic-threatening, resisting arrest, and third-degree criminal mischief, which all arose from a separate and unrelated incident involving police that is also irrelevant to this appeal. All of these charges were either severed or dismissed before trial.

## II. ANALYSIS

### A. The trial court did not err in declining to suppress Smith's statements to Detective Ditch.

Smith's first claim of error involves statements he gave to Detective Matt Ditch about the Worthington robbery while he was in jail on other charges. Smith claims that the trial court erred in denying his motion to suppress the statements, which he argues Detective Ditch procured in violation of his Fifth Amendment right to counsel. *See Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981) ("The Fifth Amendment right identified in *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] is the right to have counsel present at any custodial interrogation.").[2]

We review suppression decisions under a mixed standard of review, employing a two-step process. First, we examine the trial court's factual findings for clear error. *Welch v. Commonwealth*, 149 S.W.3d 407, 409 (Ky. 2004). We treat those findings as conclusive if supported by substantial evidence. *Bauder v. Commonwealth*, 299 S.W.3d 588, 591 (Ky. 2009). We then review the application of the law to those facts *de novo*, giving no deference to the lower court's legal conclusions. *Id.*

---

[2] The Fifth Amendment right to counsel is distinct from the right to assistance of counsel guaranteed by the Sixth Amendment, which is offense-specific and attaches generally upon the initiation of judicial proceedings against the accused. *See Maine v. Moulton*, 474 U.S. 159, 168–70 (1985). Because no criminal proceedings had yet been initiated against Smith on the subject matter of Detective Ditch's questioning (the Worthington robbery), as Smith concedes, the Sixth Amendment's guarantees did not apply.

5

Smith's claim rests on an alleged violation of his rights under the Fifth Amendment as laid out by the United States Supreme Court in *Miranda.* Broadly speaking, to protect the Fifth Amendment right not to incriminate oneself, *Miranda* laid out a set of constitutionally mandated guidelines that state authorities must follow to obtain self-incriminating statements that may be used against the defendant at trial. *See United States v. Dickerson*, 530 U.S. 428, 434–35 (2000). The *Miranda* requirements are geared toward mitigating against the inherently coercive nature of isolated and pressured interactions with police—namely, custodial interrogations. *Id.* Those protections are not implicated unless and until the suspect is both "in custody" and subject to interrogation[3] by the state. *Rhode Island v. Sims*, 446 U.S. 291, 300–01 (1980). To introduce statements obtained through in-custody interrogation without a lawyer present, the state has the burden of showing that the defendant knowingly and intelligently waived his rights and chose to speak to police voluntarily. *Miranda*, 384 U.S. at 475; *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

If a suspect clearly asserts his right to remain silent and to have counsel, a bright-line rule prohibits any further questioning without counsel being present. *Edwards*, 451 U.S. at 484. The *Edwards* rule in effect renders any post-invocation waivers presumptively invalid—post-invocation waivers are not considered voluntary if obtained through police persistence. *Id.* The rule bars

---

[3] It does not appear that the "interrogation" requirement for applying *Miranda* was ever disputed, and it is not at issue in this appeal.

"police from badgering a defendant into waiving his previously asserted *Miranda* right ... by presuming his postassertion statements to be involuntary." *Montego v. Louisiana*, 556 U.S. 778, 787 (2009).

But that bright-line presumption is overcome if the suspect himself "initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversations or discussions with the authorities." *Minnick v. Mississippi*, 498 U.S. 146, 156 (1990). "Only the suspect may reinitiate dialogue with the authorities; the authorities cannot continue to cajole or otherwise induce the suspect to continue to speak without first affording the suspect an attorney." *Bradley v. Commonwealth*, 327 S.W.3d 512, 518 (Ky. 2010).

*Edwards* does not, however, protect a *Miranda* invocation in perpetuity. Instead, it is subject to an expiration date of sorts, recognizing that the coercive pressures engendered by a custodial setting subside as time passes after a break in custody. *See Maryland v. Shatzer*, 559 U.S. 98, 107–08 (2010). Indeed, the Supreme Court crafted a bright-line rule dictating when the *Edwards* presumption expires: 14 days. *Shatzer*, 559 U.S. at 110. "That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* So once 14 out-of-custody days have passed, law enforcement is

not barred from rewarning under *Miranda* and reinitiating questioning; the onus is then on the suspect to reinvoke or waive.

With those general principles in mind, we turn to what happened here. As mentioned above, Smith was arrested for the Pino robbery on January 24, 2014. He remained thereafter in the Louisville Metro Department of Corrections jail on those charges. While he was in jail, police investigations tied him to the other two robberies as well. Detective Ditch was the lead investigator for the Worthington case.

On March 7, Detective Ditch traveled to the jail and met with Smith in an interrogation room. He attempted to ask Smith questions, but Smith "immediately refused" to speak to him and instead "lawyered up." So the detective ceased questioning and left.

Almost a month later, on April 3, Detective Ditch returned to the jail, at an Assistant Commonwealth's Attorney's request, to again try to speak to Smith about the Worthington robbery. The second time around, Smith was more receptive—he eventually conceded to the detective that one of the men on the Jewish Hospital surveillance footage was indeed he, yet maintained that he was innocent of the Worthington assault and robbery. An audio recording of this interview was played for the jury at trial.

In claiming that the Constitution required suppressing his statements to Detective Ditch, Smith begins by arguing that his invoking his *Miranda* rights when the detective first tried to speak with him on March 7 barred the later questioning on April 3. Once he invoked, he insists, law enforcement was

8

prohibited from questioning him at all unless counsel was present or Smith reinitiated dialogue with the authorities himself. Since he did not initiate further communications with law enforcement nor was an attorney made present, Smith contends Detective Ditch violated his rights when he returned on April 3 to try again to get him to talk. So he insists that any waiver of his rights after being rewarned of them was ineffective under *Edwards*'s bright-line prohibition against post-invocation questioning. A suspect's subsequent waiver after invoking is deemed involuntary and invalid if it was the product of police prodding—he claims that is exactly what the second try on April 3 was.

Smith is mistaken. His argument, given *Shatzer*'s 14-day rule, presupposes that he remained "in custody" under *Miranda* during the nearly month-long period between Detective Ditch's visits. In doing so, he relies on a flawed premise: he takes as granted that "locked up" equals "in custody"—it does not.

What Smith's argument loses sight of is that in this Fifth Amendment context, *custody* is a judicially defined legal term of art, untied as it were from many of the usual senses of the term—it is limited to circumstances that entail "a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Just because a person is incarcerated when interviewed does not invariably mean that he is in "custody" for *Miranda* purposes. *See id* at 508. More to the point, at least where the custodial interrogation is unrelated to the reason the suspect is incarcerated, an inmate-suspect's post-invocation return to the jail's general population is conceptually indistinguishable from an unjailed suspect's

9

invoking, being released from custody, and going home. *See Shatzer* 559 U.S. at 113–14.

So once Smith was returned to the jail's general population after he invoked on March 7, he was no longer in custody under *Miranda*. Because more than 14 noncustodial days passed before Detective Ditch returned on April 3, that earlier invocation did not bar the detective from reinitiating questioning after he rewarned Smith of his rights, which Smith was then obliged to reassert or else waive.

Smith argues that even if his March 7 invocation should be deemed to have expired, suppression was still required because he indeed reasserted his rights on April 3; the Commonwealth disagrees, insisting that he waived them and spoke to the detective voluntarily.[4]

If Smith is correct, of course, we would be left to conclude that the *Edwards* rule should have barred the admission of his statements. 451 U.S. at 485. The applicability of that "rigid" rule requires courts to "determine whether

---

[4] The Commonwealth also argues, as an alternative ground for affirming the trial court's decision not to suppress the statements here, that Smith was not actually "in custody" under *Miranda* during the April 3 questioning. The trial court's order denying Smith's motion to suppress did not address, at least explicitly, whether the interrogation was custodial; its ruling that Smith validly waived his *Miranda* rights, though, implies that it believed it was custodial.

If the Commonwealth is correct and the interrogation was noncustodial, then there could have been no infringement of the *Miranda* right allegedly invoked. *See Rhode Island v. Innis*, 446 U.S. 291, 298 n.2 (1980). To be sure, the custody question comes before the invocation-waiver question in the analysis—the answer to the former dictates whether the latter even needs to be asked. But despite that, we choose to pass on the custody question here because it is unnecessary to affirm the trial court. As we explain below, we agree with the trial court that suppression was not required because Smith did not clearly assert, and thus waived, his right to have counsel present during questioning before he voluntarily spoke to the detective.

10

the accused *actually invoked* his right to counsel." *Davis v. United States*, 512

U.S. 452, 459 (1994) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984)). So the

question is: Did Smith clearly ask for counsel to be present during the

custodial interrogation? To answer that requires us to consider the relevant

dialogue between suspect and detective.

Detective Ditch kicked off the April 3 encounter with Smith by reading

aloud all of his *Miranda* rights—including his right to cut off questioning at any

time and ask for counsel—from a waiver form that he hoped to have Smith

sign. This exchange followed:

> Ditch: If you would sign [the waiver form] for me before I talk to
> you, I'd appreciate it. You don't have to. If it's, it's—you do
> know how to read, right?

> Smith: Mmm hmm [affirmative].

> Ditch: You know how to read and write? Okay, if you would, sign
> that where it says "Signed," and I'll sign as a witness. Then
> I'll put the time down. You want me to read it to you? Okay.

> Smith: So what is this for?

> Ditch: I'm gonna show you. And I'm gonna, I'm gonna—trust me,
> you want to see this. Okay?

> Smith: What is this for though? Can I—can I know what it's for?

> Ditch: It's pertaining to you. And it's pertaining to a report.

> Smith: I don't know man.

> Ditch: But here's the thing. There's nothing incriminating on it,
> okay? If you don't want to sign that, that's fine with me,
> okay?

> Smith: Yeah, I'd just rather have my lawyer present.

> Ditch: You don't want to sign that?

11

Smith: No.

Ditch: Okay. So the question, then, is: do you want to talk to me?

Smith: I'll answer as many questions as I can.

Ditch: Okay, so you will talk to me?

Smith: Yeah.

Ditch: Right now?

Smith: Yeah.

Ditch: Without your lawyer here? Without having a courtroom or anything like that?

Smith: Yeah.

Ditch: Okay. But you don't want to sign this rights-waiver form?

Smith: Mmm mmm [negative].

Ditch: Okay. But you do understand your rights?

Smith: Mmm hmm [affirmative].

Ditch: Let me just read 'em to you again, so there's no question. And I understand that you don't want to sign it. I'm gonna write right here, "refused to sign." Alright? So I'm just going to read it to you again just so there's no questions about it. You have the right to remain silent—

Smith: [inaudible] I understand. I just want to know, maybe, I don't know man. I don't know what—

Ditch: Here, let's do this. You do understand your rights?

Smith: Yeah.

Ditch: Okay. I have some stuff I want to show you.

Smith: Okay.

Ditch: If you decide you don't want to talk about it, you don't have to.

Smith: Okay.

12

Ditch: If you decide, you know—whatever. This is all about you, okay?

Smith: Yeah.

Ditch: So do you understand your rights? And you do want to talk to me right now? Okay, can you say it out loud please?

Smith: Mmm hmm [affirmative].

Ditch: Yeah? Okay, so you just don't want to sign this?

Smith: Mmm mmm [negative].

Ditch: But you do understand it, and you do want to talk to me? Alright.

Detective Ditch then questioned Smith about his presence on the Jewish Hospital surveillance footage and his role in the Worthington robbery.

Smith maintains that his statement about wanting to have his lawyer present was a clear request for counsel that required Detective Ditch to immediately cease questioning. Because the detective instead "ignored," as Smith puts it, the alleged request for counsel and persisted, Smith argues that the statements the detective subsequently elicited from him were taken in violation of *Miranda* and so could not be admitted against him under *Edwards*. There is some surface appeal to this argument; but it wanes under scrutiny.

To be sure, Smith told the detective, "I'd rather have my lawyer present." But he said that when asked if he would sign the detective's waiver form, not when asked if he would speak to the detective at all. The reference to his lawyer did not assert his desire for counsel to be present for questioning, as protected by *Miranda* and *Edwards*; it asserted only his desire for counsel's assistance with signing the form. And in this regard, there is no question about whether

Smith understood his rights—he confirmed, seemingly exasperatedly, numerous times during the back-and-forth that he did. Plus, that he invoked those rights less than one month earlier is a good indication of his clear understanding and familiarity with them. Here, he was apparently just leery of signing something without his lawyer. Detective Ditch made clear that Smith did not have to sign it if he did not want to—he did not want to sign it without his lawyer, so he did not.

If any doubts lingered, Detective Ditch's follow-up questioning laid them to rest. He asked Smith to clarify whether he wanted to have an attorney present during questioning in general, or whether he was actually okay with speaking to the detective at that time (and just didn't want to sign the waiver form without his attorney). In responding to those clarifying questions, Smith could hardly have been clearer—he had no qualms about speaking to Detective Ditch at that time without counsel present.

In the end, the reference to his lawyer, clarified as it was by the detective, was simply not the type of unambiguous and unequivocal assertion of the right to counsel that would have otherwise required the detective to cut off the interrogation. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, ... the cessation of questioning" is not required. *Davis*, 512 U.S. at 459. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would

14

understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.*

Smith's statement failed to meet that required level of clarity. Instead, he articulated rather clearly the opposite—that he did not desire counsel's presence during questioning. The Fifth Amendment, under the *Miranda-Edwards* caselaw, prohibits further police questioning once a suspect indicates his desire to have counsel present; it does not prohibit further police questioning to flesh out whether a suspect has in fact indicated that desire.

Because Smith did not clearly assert his right to have counsel present for questioning under *Miranda*, Detective Ditch's continued questioning of him was permissible. The trial court did not err in admitting the statements that he gave during that questioning.

## B. The trial court did not abuse its discretion in prohibiting Smith from introducing evidence about his refusal to sign the waiver form.

Smith's next complaint is also related to the April 3 questioning by Detective Ditch. With the trial court having rebuffed his attempt to suppress the April 3 statements, Smith sought to introduce evidence that the detective elicited those statements despite his refusing to sign the rights-waiver form without counsel. He argued that this evidence touched on the reliability of his statements to Detective Ditch—it was evidence, he insisted, of his being coerced into making unreliable statements. The trial court rejected that argument and excluded any reference to his refusal to sign the form. The court

concluded that Smith was merely attempting to relitigate the suppression issue—a matter of law for the judge, not fact for the jury.

On appeal, Smith maintains that this barred him from informing the jury of all the circumstances surrounding his statements to Detective Ditch, and so violated his right to present a defense. He impugns the trial court's allegedly flawed logic as "rest[ing] on the apparent assumption that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." *Crane v. Kentucky*, 476 U.S. 683, 687 (1986).

The problem for Smith in making this argument is that he only assumes, but does not show how, the evidence at issue here in fact bears on the credibility of his statements to Detective Ditch. He never explains how his refusal to sign the waiver form, alone, should cast doubt on the credibility or reliability of his subsequent, voluntary statements. His mere refusal to sign the form doesn't seem to say anything at all about the credibility or reliability of what Smith later told the detective.

To be sure, we recognize that "the physical and psychological environment that yield[s] [a] confession can ... be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Crane*, 476 U.S. at 689. But Smith's refusal to sign the waiver form without counsel being present in no way shows or even implies that the detective's continued questioning somehow overbore his will or otherwise rendered his answers unreliable. That evidence simply does not say anything at all about how

16

truthful or untruthful he was with the detective—it does not cast doubt on his statements' credibility.

The case that Smith quotes, *Crane v. Kentucky*, is informative. In *Crane*, the defendant's defense was that no physical evidence linked him to the crime and that there were numerous reasons why his confession should not be believed. *Id.* at 691. He sought to convince the jury that he, young and uneducated, was held at length against his will in a small, windowless room until he succumbed to the pressure to confess to every unsolved crime in the county. *Id.* So "introducing evidence of the ... circumstances that yielded the confession was all but indispensable to any chance of [his defense] succeeding." *Id.*

The same cannot be said of the evidence at issue here. His mere refusing to sign the waiver form says nothing about the physical or psychological circumstances that yielded a confession. (We use the term *confession* loosely here because Smith admitted only that he was one of the men in the surveillance footage; he maintained his innocence despite that concession.)

Instead, it seems clear that Smith offered this evidence, not to assist the jury in judging the credibility or reliability of his statements, but rather to try to turn the jury against the prosecution by impugning law enforcement's investigation tactics. Indeed, Smith's own arguments below confirm this suspicion—he argued to the trial court, after all, that "this is about the detective, and what he was doing, and his investigation, and the things that he

was prepared to do, up to and including continuing to interview someone who has already ... refused to waive his rights."

Police or prosecution tactics are not subject to attacks geared at nothing more than making the state look bad. Where nothing about the tactics actually implicates the credibility or reliability of the evidence they uncovered, they lack evidentiary worth. Attempts to garner sympathy from the jury by turning it against state authorities are not protected by the Constitution, which guarantees criminal defendants "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 476 U.S. 479, 485 (1984). Anti-police sentiment (and anti-prosecution sentiment by extension) is not a defense—the Constitution does not guarantee criminal defendants an opportunity to engender it.

We review a trial court's decision to exclude evidence for abuse of discretion, meaning we will reverse only if it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). The trial court here acted well within its discretion when it excluded evidence related to Smith's refusal to sign the waiver form without having an attorney present.

### C. The admission of Smith's hooded sweatshirt was not reversible error.

Smith also complains about the trial court's allowing the Commonwealth to introduce into evidence a black hooded sweatshirt that police discovered when executing a search warrant for his property being held by Louisville Metro Department of Corrections. According to Smith's counsel, the sweatshirt

18

was taken from him after an earlier arrest in 2011 and is completely unrelated to the arrest and charges in this case. The Commonwealth does not dispute this, at least to the extent that it concedes that it does not know how or when the sweatshirt came to be included in Smith's property with the jail.

Smith thus insists that the evidence was inadmissible both under KRE 401 and 402 as irrelevant, and under KRE 403 as posing a danger of undue prejudice that substantially outweighed its probative value. The sweatshirt evidence was unduly prejudicial, he contends, because some of the witnesses testified that one or both assailants wore a dark or black "hoodie." He complains that introducing the sweatshirt thus unduly inculpated him further by improperly corroborating and tying to Smith the dark-hoodie testimony, despite the fact that he was wearing a brown zip-up jacket when he was arrested and when he appeared on the bus and hospital surveillance.

We agree with Smith that this sweatshirt should have been excluded from evidence. Its relevance and probative value do not seem to have been sufficiently established to permit its being used as evidence against him—the mere fact that the hoodie was included with Smith's property being held by the jail does not alone tie it in any way to the charged offenses. The Commonwealth, in offering this evidence, was obliged to establish its relevance and probativeness; by its own concession, it was unable to do so.

Despite that, we agree with the Commonwealth that any error in admitting the sweatshirt was harmless and does not require reversal. An erroneous admission of evidence is harmless "if the reviewing court can say

19

with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009). We can say that here.

Simply put, the evidence against Smith was overwhelming. Several witnesses positively identified him, and the identifications had little or nothing to do with whether he was wearing a "dark hoodie." Clear surveillance footage tied him to the Kingsolving robbery and captured the Worthington robbery. His own statements to police also tied him to the crimes (while trying to deflect blame onto his unidentified companion). Indeed, apparently recognizing the wealth of evidence pointing to his guilt, Smith's entire defense effectively turned on selling the jury on the theory that his companion had in fact committed the charged crimes in every instance—the jury obviously did not buy it.

So when all of the evidence here is considered alongside the relative immateriality of the complained-about sweatshirt evidence, we have no doubt that admitting that evidence did not substantially sway the jury's verdict convicting Smith of each of the charged crimes.

## D. Joinder of the separate offenses did not unduly prejudice Smith.

Smith's last claim of error involves the trial court's denial of his motion to sever and try separately the various charges related to the Kingsolving, Worthington, and Pino robberies.

RCr 6.18 allows for the joinder of multiple offenses if they "are of the same or similar character or are based on the same acts or transactions

20

connected together or constituting parts of a common scheme or plan." But even if joinder is permitted under that rule, "the court shall order separate trials of counts ... or provide whatever other relief justice requires" if it appears that the joinder will result in prejudice to either the defendant or the Commonwealth. RCr 8.31.[5] The prejudice contemplated by this rule is "undue prejudice"—which goes beyond the prejudice that is inherent to being tried at all to that which is "unnecessary or unreasonable." *Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky. 2013); *see also Parker v. Commonwealth*, 291 S.W.3d 647, 656–57 (Ky. 2009).

These two rules, RCr 6.18 and 8.31, thus seek to strike a balance between the prejudice inherent to joining separate charges in a single trial and the interests of judicial economy. *Murray v. Commonwealth*, 399 S.W.3d 398, 405 (Ky. 2013). Recognizing that trial courts are in the best position to strike the proper balance, appellate courts have long afforded them much discretion in handling joinder issues. *Id.* So a reviewing court will not overturn a severance decision absent "a showing of prejudice and a clear abuse of discretion." *Cohron v. Commonwealth*, 306 S.W.3d 489, 493 (Ky. 2010). Even if the failure to sever counts was in error, "an erroneous severance ruling does not justify appellate relief unless it resulted in actual prejudice to the party opposing the ruling." *Peacher*, 391 S.W.3d at 838.

---

[5] At the time of Smith's trial, RCr 9.16 was the applicable rule. RCr 8.31 has since replaced that rule without changing its substance.

21

At the outset, joinder was permissible here because the separate offenses were undoubtedly of the "same or similar character." RCr 6.18. Briefly, they all involved opportunistic robberies—thefts involving both threatened and use of force—of strangers at night, committed within close proximity to each other, both spatially and temporally. The primary perpetrator in all three was a black male who was on foot and wore a dark jacket, and he was accompanied by a shorter man in a lighter colored sweatshirt. The crimes were also similar in other respects—for example, in all three robberies, the suspect initiated contact with the victim by asking a question. In the Worthington and Pino robberies, the suspect first asked for a cigarette before attacking the victim; and Kingsolving's robber first asked him how to get to a nearby bar before attacking and robbing him.

We have said that RCr 6.18 provides for liberal joinder of offenses. *Peacher*, 391 S.W.3d at 837. It is proper when, as here, "the crimes are closely related in character, circumstance, and time." *Seay v. Commonwealth*, 609 S.W.2d 128, 131 (Ky. 1980). The three separate incidents were sufficiently similar to permit joinder under the "same or similar" rubric of RCr 6.18. Even so, the facts here also arguably support joinder of the offenses as "constituting parts of a common scheme" to rob people when opportunity struck. *Cf. Chestnut v. Commonwealth*, 250 S.W.3d 288, 300 (Ky. 2008).

Of course that does not end our inquiry; we must still assess whether Smith showed that, despite those similarities, trying the separate offenses in

22

one trial unduly prejudiced him. Because joinder of same-or-similar offenses often raises the same concerns addressed by KRE 404—which prohibits other-bad-acts evidence from being introduced to show bad character or criminal disposition—one of the primary considerations in assessing whether joinder resulted in undue prejudice is the extent to which evidence proving each offense would be admissible in a separate trial of the other offenses. *Peacher*, 391 S.W.3d at 838; *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky. 2002).

But we need not delve into that analysis to resolve this claim. Even if Smith is correct that the trial court should have severed the separate charges, and that the failure to do so was an abuse of discretion, he is still not entitled to relief because he cannot show that he was actually prejudiced by their joinder. *See Peacher*, 391 S.W.3d at 838. That is because we can say with fair assurance that the jury's beliefs as to each of the offenses were not "substantially likely to have been tainted" by inadmissible evidence of the others. *Id* at 839 (quoting *Rearick v. Commonwealth*, 858 S.W.2d 185, 188 (Ky. 1993)) (cleaned up). One factor in assessing prejudice resulting from joinder is "the strength of the evidence of the separate crimes." *Id.* (citing federal cases). Indeed, prejudice is unlikely "where the admissible evidence of the offense is overwhelming"; it is "more likely to the extent that weaker evidence of one offense is improperly bolstered by the spillover of strong evidence of the other offense." *Id.*

Because Smith's case is of the former rather than latter variety—that is, the evidence of each offense, standing alone, was so strong as to be fairly

23

overwhelming—there was little likelihood of prejudice resulting from trying the separate counts together. Smith has shown us nothing to suggest that joining them in one trial resulted in any actual undue prejudice.

### III. CONCLUSION

The judgment of the Jefferson Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Bruce P. Hackett
Chief Appellate Defender

Joshua Michael Reho
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Matthew Robert Krygiel
Assistant Attorney General