JONES, JUDGE:
This case is before us on discretionary review. During the proceedings below, the Leslie District Court determined that the Appellant, E.C., was a juvenile sexual offender. On appeal, the Leslie Circuit Court affirmed. We granted discretionary review. E.C. asserts that the district court's adjudication cannot stand because it is based on a statement he made to law enforcement without having received any Miranda[1] warnings, and therefore, violates the Fifth Amendment of the United States Constitution. Alternatively, E.C. maintains that he was denied Due Process when the district court failed to afford him a proper formal adjudication hearing. Having reviewed the record in conjunction with applicable legal authority, we REVERSE and REMAND this matter for further proceedings consistent with this opinion.
I. BACKGROUND
On August 25, 2014, E.C., who was thirteen years old, traveled with his mother, Christine, to the Office of the Cabinet for Health and Family Services (the "Cabinet") to meet with their social worker, Paula Roberts. E.C. and his mother believed they were going to meet with Ms. Roberts to discuss E.C.'s placement. E.C.'s maternal grandmother had legal custody of E.C.[2] However, the grandmother requested E.C. to leave her house after he was alleged to have sexually abused his two-year-old cousin, S.F. The abuse allegedly took place on August 21, 2014, four days prior to the meeting in question.
Unbeknownst to E.C. and Christine, Kentucky State Police Detective, Vickie Day, had requested the Cabinet to set up the meeting so that Detective Day could question E.C. about the sexual abuse allegations. Detective Day first spoke to Christine. During their conversation, Detective Day asked Christine a series of questions about E.C., his school, and the like. Detective Day then asked Christine if she was aware of the allegations against E.C. Christine indicated that she was aware of the allegations but that she did not have any idea what transpired between E.C. and his cousin. Christine explained that on the day in question, E.C. came home from school and went upstairs. S.F. and E.C.'s younger brother were already upstairs. When S.F. came downstairs, S.F.'s mother observed what appeared to be blood on her leg. Upon further examination, S.F.'s mother noted that she also had blood on her panties. Christine told Detective Day that around the same time, E.C. came downstairs to use the restroom.
*174 After doing so, he told Christine that his penis burned when he urinated. Christine told Detective Day that she gave E.C. some Vaseline to put on his penis. Detective Day asked Christine if she thought it was a rather large coincidence that E.C. was complaining of pain in his genital region at about the same time the family noticed blood on S.F.'s panties. In response, Christine denied that E.C. was capable of sexually abusing his cousin. She also denied being aware of E.C.'s having ever been sexually abused himself.
Detective Day then told Christine that she wanted to talk to E.C. and "get his side of the story." Christine told Detective Day that she did not have a problem with her talking to E.C. At this point, Detective Day asked Christine who had custody of E.C. Christine responded that her mother had custody, but it was her understanding that her mother was going to sign custody back over to her. At this point, Christine began asking questions about how to obtain E.C.'s clothing and other belongings from her mother's house. Ms. Roberts answered these questions. All three then began discussing whether E.C. should continue with his current school placement, as some of his classmates had learned about the allegations against E.C. Near the end of the conversation, when discussing counseling for E.C., Detective Day told Christine, for the first time, that the matter involved a "criminal charge" and the court might have to order counseling for E.C.
After securing Christine's permission to question E.C., Detective Day invited E.C. into a conference room. E.C. was seated in the conference room with Detective Day and Ms. Roberts. The door was closed, but not locked. Christine remained in a separate waiting room adjacent to the conference room. After E.C. was seated, Detective Day introduced herself and told E.C. that she was a detective with the Kentucky State Police. She explained that most of the cases she worked were cases with social services. At this point, E.C. asked Detective Day what she meant by social services. Detective Day responded that social services would be cases with people like Ms. Roberts. Detective Day told E.C. that she was involved because of the "situation that happened last week" with E.C.'s cousin.
Detective Day then asked E.C. some basic questions such as his full name, birthdate, and the names of his parents and grandparents. Detective Day then began asking E.C. about his relationship with his parents, specifically his father. E.C. told Detective Day that his father was "mean" to him when he lived with him. Detective Day asked E.C. to explain how his father was mean to him. E.C. provided some examples regarding his father's disciplining him harshly. For the next several minutes, E.C. discussed his basketball career.
Thereafter, Detective Day explained to E.C. that most of the cases she works on deal with children and matters of a "sexual nature." She told E.C. that she got the complaint about S.F. the night of the alleged incident. She explained that she was "just trying to get [his] side of the story and get to the bottom of it and just see what we need to do and where we need to go from here." Detective Day then asked E.C. to tell her what happened on the day in question beginning with the time after he got home from school. E.C. explained that he did not go to his scheduled work out that day, but instead went home. He stated that he was upstairs with his younger brother and S.F. He watched the two younger children play a video game. After a while, E.C. went downstairs to use the bathroom. E.C. explained that when he urinated, he noticed that his penis was a *175 little raw and bloody from him being sweaty the last several days.
Detective Day then told E.C. that when S.F. came downstairs she had blood on her. E.C. immediately responded that he did not know "what happened there." Detective Day continued to explain to E.C. that S.F. told the adults downstairs that E.C. "had hurt her frog."[3] E.C. told Detective Day that he had no idea why S.F. said he hurt her. He again reiterated that he was just sitting in the room while the two younger children played with each other. Detective Day asked E.C. how he thought S.F. got blood on her. E.C. said he "had no clue." Detective Day then explained to E.C. that S.F.'s mother took her to the hospital where hospital staff performed a sexual assault kit on her. Detective Day explained that the hospital staff could tell from the examination whether anyone put an object, like a penis, into S.F.'s vagina. E.C. again denied doing anything to S.F.
Despite E.C. having already denied the allegations several times, Detective Day pressed on. At this point, Detective Day told E.C. that "if something has happened we need to get you counseling." She told E.C. that sometimes people sexually abuse other people because they have been abused in the past. E.C. told Detective Day he understood her point. She then asked him what happened with his father. E.C. responded that his father was "always touching him with his hands." In response to Detective Day's question, E.C. said the touching was inside his clothing and occurred in 2009 or 2010. E.C. said his father only did this once, and that he smacked his father's face when he tried to touch him. E.C. denied that his father ever asked E.C. to touch him. E.C. also denied that anyone else had ever touched him. Detective Day asked E.C. if he wanted to press criminal charges against his father "or leave it alone." E.C. responded that he wanted to leave it alone. E.C. said he hated his father, but that he did not want to see him get in trouble.
At this point, Detective Day directed the conversation back to S.F. She again told E.C. that the rape kit performed by the hospital would reveal if something happened to S.F., and that if it was positive she had no other choice than to believe that E.C. sexually abused S.F. because he was the only one with her. E.C. responded quite affirmatively that he understood, but again denied hurting S.F. Detective Day told E.C. that if something did happen, it was very important for them to get E.C. into counseling, and that her goal was to get E.C. some help. Next, Detective Day promised E.C. that they would "keep everything very quiet" and that E.C. could deny it at school if anyone asked him about it. Then Detective Day told E.C. that since they were being honest with one another and "weren't going to say anything to anybody" she had a question to ask him. She preceded to ask E.C. if he had "ever done anything like this before" and "was this the first time." E.C. responded, "I'd say yea." Detective Day asked E.C. if he "had seen this stuff before because usually guys have seen this stuff before they try it." E.C. responded that he had seen his father having sex about three times. Detective Day then questioned E.C. on whether he had ever had sex with someone his own age. He responded negatively. She followed up with asking E.C. about "why someone so much younger?" E.C. responded, "why would you ask me?" Detective Day again asked E.C. what happened with S.F. on the day in question. E.C. stated, "beats me."
*176 After a few minutes of general conversation, Detective Day asked E.C. if his younger brother saw what happened between E.C. and S.F. E.C. said that his brother was just playing his video game. Detective Day then asked E.C. if he had any questions for her or Ms. Roberts. Detective Day advised E.C. that he would have to apologize to S.F. and the family. She also advised E.C. that he "would have to go to court over this...." After a few minutes, E.C. complained about having some ink on his fingers. Ms. Roberts told E.C. that they would let him go wash his hands and then talk to Christine. At this point, the interview ended.
E.C. left Ms. Robert's office with his mother. Approximately four hours after meeting and talking with E.C., Detective Day swore out a complaint in Leslie County Juvenile Court charging E.C. with Rape in the First Degree and he was taken into custody. E.C. filed a motion to suppress the statements he made to Detective Day during the August 25, 2014, interview for violation of Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
On April 5, 2016, a joint suppression hearing and adjudication hearing were held. The Commonwealth called Detective Day, who testified about the injuries sustained by S.F. Detective Day also testified regarding the August 25, 2014, interview. Detective Day testified that she did not advise E.C. of his rights pursuant to Miranda because he was not in custody at the time of the interview. She testified that she told E.C. that the purpose of the interview was to get E.C.'s side of the story, but that she did not inform E.C. that he did not have to talk to her or that he was free to leave the interview at any time. Detective Day also testified that she did not interview E.C. at school to avoid making the interview custodial. Additionally, Detective Day testified that she intentionally waited four hours to arrest E.C. because she wanted to avoid a Miranda issue.
Next, the Commonwealth called Paula Roberts. Ms. Roberts testified that she met with E.C. at his school prior to his interview with Detective Day. Ms. Roberts indicated that she met with E.C. due to a "risk of harm" referral and wanted to make sure his mother was an appropriate custodial caregiver. Ms. Roberts further testified that she asked E.C. and Christine to come to her office at a later date to be interviewed. She stated that they agreed. Ms. Roberts testified that Christine and E.C. were asked to her office that day, in order for them to be interviewed by the Kentucky State Police. Ms. Roberts did not recall if she had advised Christine or E.C. that they would be interviewed by the Kentucky State Police prior to their arriving at her office.
E.C.'s grandmother testified that she had custody of E.C. at the time of the allegations. She testified that Detective Day asked her for permission to talk to E.C. about the allegations. She testified that she gave her permission for the interview, but could not recall if she was told that the interview could result in criminal charges being brought against E.C.
Christine testified that she was first contacted by Ms. Roberts. At that time, Ms. Roberts informed Christine that E.C.'s grandmother no longer wanted to have custody of E.C. Ms. Roberts told Christine that she needed to meet with her to discuss an appropriate placement for E.C. Christine believed that the sole purpose of the August 25, 2014, meeting was to discuss legal and physical custody of E.C. Christine did not have any idea that any law enforcement officials would be present at the meeting.
Next to testify was E.C. E.C. testified that he believed the meeting was for the *177 purpose of discussing with Ms. Roberts if he could remain in the physical custody of his mother. E.C. then testified that he believed that he could not leave the conference room because he was being interviewed. The Commonwealth then sought to cross-examine E.C. regarding the allegations made by S.F. Counsel for E.C. objected. After taking a recess to review the recording of the interview, the district court overruled E.C.'s motion to suppress. The district court held that Detective Day was not required to give E.C. any Miranda warnings because he was not in custody when Detective Day interviewed him. The district court reasoned that E.C.'s mother, who had physical custody of him; E.C.'s grandmother, who had legal custody of him; and E.C. all gave permission to Detective Day. The district court then directed E.C. to return to the stand for further questioning. The Commonwealth then questioned E.C. regarding the allegations made by S.F. According to E.C., on the day in question, the blood on his penis was a result of playing basketball. E.C. denied ever touching or harming S.F. No other witnesses testified.
At a subsequent hearing, the district court issued its findings of fact and conclusions of law. Ultimately, the district court determined that E.C. was guilty of rape in the first degree. The district court imposed the mandatory sentence of commitment to the Department of Juvenile Justice as a Juvenile Sex Offender. Subsequently, E.C. appealed the disposition to the Leslie Circuit Court. The circuit court affirmed the district court's decision. This appeal followed.
II. STANDARD OF REVIEW
Our standard of review of a decision on a suppression motion following a hearing is twofold. First, the factual findings of the court are conclusive if they are supported by substantial evidence. The second prong involves a de novo review to determine whether the court's decision is correct as a matter of law. Stewart v. Commonwealth , 44 S.W.3d 376, 380 (Ky. App. 2000). As explained in Commonwealth v. Lucas , 195 S.W.3d 403, 405 (Ky. 2006) :
This Court has used a de novo standard of review in deciding whether the Fifth Amendment protection against self-incrimination is applicable to a particular situation. See Welch v. Commonwealth, 149 S.W.3d 407 (Ky. 2004). Both the U.S. Supreme Court and the Sixth Circuit Court of Appeals have held that the question of whether a defendant is in custody is a mixed question of law and fact to be reviewed de novo. See Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) and United States v. Salvo, 133 F.3d 943 (6th Cir. 1998). We also recognize that the findings of the trial judge are conclusive if supported by substantial evidence and the decision must have been demonstrated to have been clearly erroneous. See Clark v. Commonwealth, 868 S.W.2d 101 (Ky. App. 1993) citing RCr 9.78 and Harper v. Commonwealth, 694 S.W.2d 665 (Ky. 1985), cert. denied 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).
With these standards in mind, we now turn to the issues E.C. raises on appeal.
III. ANALYSIS
The Fifth Amendment, which applies to the states via the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V.[4] The Fifth Amendment's *178 protection is so fundamental that it has been deemed "the mainstay of our adversary system of criminal justice." Johnson v. State of N.J. , 384 U.S. 719, 729, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." Miranda , 384 U.S. at 478, 86 S.Ct. 1602. To safeguard the individual's Fifth Amendment rights, authorities must give adequate warnings. Id. The individual must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 478-79, 86 S.Ct. 1602. Only after these warnings have been given may the individual knowingly and intelligently waive his Fifth Amendment right to remain silent. Id.
However, not all questioning about criminal activity requires Miranda warnings. Two elements are necessary to trigger the Miranda requirements. Smith v. Commonwealth , 520 S.W.3d 340, 346 (Ky. 2017). First, the questioning must be done by law enforcement or at its behest. Id. Second, the individual must be in custody. Id. When both elements are present, Miranda warnings must be given before questioning by law enforcement. Without the warnings, an individual in custody cannot be deemed to have waived his or her Fifth Amendment rights. Moreover, the Miranda warnings must be given to the individual. A parent or guardian of a minor cannot consent on behalf of the minor. See KRS 600.010(2)(g) ("It shall further be the policy of this Commonwealth to provide judicial procedures in which rights and interests of all parties, including the parents and victims, are recognized and all parties are assured prompt and fair hearings. Unless otherwise provided, such protections belong to the child individually and may not be waived by any other party.").
While E.C. was questioned at the Cabinet's office in the presence of his social worker, Ms. Roberts, Detective Day did almost all of the questioning. Ms. Roberts did not intervene in the interview, attempt to gather information herself, or otherwise assist E.C. Ms. Roberts's role appears to have been limited to securing the presence of E.C. and his mother at the Cabinet's office so that Detective Day could interview them. Given the limited role Ms. Roberts took during the interview, we have little difficulty concluding that E.C. was questioned by law enforcement for the purpose of assisting in the criminal investigation surrounding the allegations made against him. It was not for the purpose of making a decision about his placement. Therefore, the "law enforcement" threshold requirement of Miranda is met.
A custodial interrogation is broadly defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. The determination of whether the defendant is in custody at the time of questioning is based on objective circumstances, not the subjective belief of the defendant or the officers.
*179 Stansbury v. California , 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). The relevant inquiry is whether, based upon the totality of the circumstances, a reasonable person in the suspect's position would have believed he was not at liberty to terminate the interrogation and leave. Id. at 324, 114 S.Ct. 1526, 1529 ; Wilson v. Commonwealth, 199 S.W.3d 175, 180 (Ky. 2006).
The proper inquiry is explained in Smith v. Commonwealth, 312 S.W.3d 353 (Ky. 2010) :
Custody does not occur until police, by some form of physical force or show of authority, have restrained the liberty of an individual.... The United States Supreme Court has identified factors that suggest a seizure has occurred and that a suspect is in custody: the threatening presence of several officers; the display of a weapon by an officer; the physical touching of the suspect; and the use of tone of voice or language that would indicate that compliance with the officer's request would be compelled. Other factors which have been used to determine custody for Miranda purposes include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so, whether the suspect possessed unrestrained freedom of movement during questioning, and whether the suspect initiated contact with the police or voluntarily admitted the officers into the residence and acquiesced to their requests to answer some questions.
Id. at 358-59 (internal citations and footnotes omitted).
Even though the test is objective, we do consider the age of the defendant in juvenile cases.
Reviewing the question de novo today, we hold that so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of [the Miranda ] test. This is not to say that a child's age will be a determinative, or even a significant, factor in every case.... It is, however, a reality that courts cannot simply ignore.
J.D.B. v. North Carolina , 564 U.S. 261, 277, 131 S.Ct. 2394, 2406, 180 L.Ed.2d 310 (2011). Indeed, our Supreme Court has recognized that the age of the defendant minor "could carry increased weight when determining if a child is in custody." N.C. v. Commonwealth , 396 S.W.3d 852, 861 (Ky. 2013).
In N.C. , the student admitted to giving hydrocodone to another student in response to questioning by the assistant principal who was working in conjunction with the school resource officer. Id. at 854. The officer was present during the discussion. Id. After the assistant principal informed N.C. that he was subject to school discipline, the assistant principal left the room, leaving N.C. with the officer. Id. The officer then informed N.C. that he would be charged with a crime. Id. At no time was N.C. advised that he was free to leave, was given Miranda warnings, nor were his parents called. Id. Recognizing that a proper balance has to be struck between "the important public policy concerns of educators and parents to provide an appropriate and safe school environment while still protecting the individual rights of a child[,]" the Kentucky Supreme Court held that "any statement obtained may not be used against a student as a *180 basis for a criminal charge when law enforcement is involved or if the principal is working in concert with law enforcement in obtaining incriminating statements, unless the student is given the Miranda warnings and makes a knowing, voluntary statement after the warnings have been given." Id. at 865. The Court specifically pointed out that requiring officers to Mirandize minors before interrogating them in a custodial situation, like a principal's office, was not an undue burden on law enforcement "when measured against the consequences a child faces in the juvenile justice system or the adult criminal system, which clearly can be punitive." Id. at 865.
E.C. was not physically restrained by Detective Day. No handcuffs were placed on him. Likewise, Detective Day did not brandish a weapon or otherwise physically intimidate E.C. She told E.C. she was a detective with the Kentucky State Police. Given E.C.'s tender age, asserting her authority as a police detective no doubt had a subduing effect on E.C. without the need for additional displays of authority. In addition to Detective Day, Ms. Roberts was also present for the questioning. E.C. was aware of Ms. Roberts's authority to make important decisions regarding E.C.'s life. And, E.C. believed the purpose of the meeting was to discuss his placement with Ms. Roberts.
The interrogation did not take place at school as in N.C. However, this fact is far from dispositive. The interrogation was not conducted in public or in a location, like E.C.'s home, where he would feel at ease. It took place in a conference room at the Cabinet's office, a place a reasonable child would recognize as one of authority and control. The only people in the conference room were E.C., Detective Day, and Ms. Roberts. The door was closed. The interrogation lasted close to forty-five minutes. Not once was E.C. instructed that he could leave the conference room or terminate the interrogation at any time. Likewise, he was not informed that he could ask to speak with his mother, another adult, or a lawyer. We find it unfathomable that a young child sitting in a closed door conference room with two authority figures, one of whom is a state police detective, would believe he had the right to refuse to answer questions, ask for a lawyer, or terminate the interrogation at will.[5]
E.C. was never given anything close to Miranda warnings. An attorney was never mentioned. E.C. was never told he could refuse to speak with Detective Day. And, perhaps most troubling, at various points in the interrogation E.C. was misled by Detective Day regarding the consequences of speaking with her. He was told that his statements would be kept just between them, he could lie to his school friends and deny anything had happened and no one would be the wiser, and generally led to believe that counseling was the only significant consequence that could attach to a confession. Finally, we are greatly concerned by Detective Day's testimony regarding her belief that not arresting a suspect immediately following an interrogation prevents her from having to Mirandize the subject. Adopting a bright-line rule based on the amount of time that passes between the interrogation and formal arrest, as suggested by Detective Day, is unwise. It would invite too much mischief *181 by law enforcement. It is the conduct that occurs before and during the interrogation that is most important. A premeditated four-hour delay, as occurred in this case, cannot rehabilitate a constitutionally infirm confession.
In conclusion, we hold that E.C. was in custody at the time he was interrogated by Detective Day. Given the circumstances, Detective Day should have recognized the custodial nature of her interrogation and given E.C. proper Miranda warnings. Her failure to do so renders his confession inadmissible. The district court should have suppressed the confession. Given the way in which the proof in this case came in, we cannot say that the error in allowing the confession into evidence was in any way harmless. Accordingly, we reverse and remand this matter for further proceedings.[6]
ALL CONCUR.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

E.C. had been living with his grandmother for the preceding few years because his mother was incarcerated.

"Frog" is apparently the term S.F. used to refer to her vaginal area.

Kentucky's Constitution contains a similar right. Section 11 states, in pertinent part: "In all criminal prosecutions the accused ... cannot be compelled to give evidence against himself[.]"

In fact, toward the end of the interview, when E.C. complained of having gotten ink on his hands, Ms. Roberts and Detective Day, gave him permission to leave the room to go wash his hands. It is clear from a review of this portion of the record that everyone in the room viewed the adults as in being in control of when the interrogation would conclude and when E.C. would be allowed to leave.

Because we are reversing E.C.'s conviction based on the violation of his constitutional right against self-incrimination, it is unnecessary for us to reach the other issues raised by E.C.