RENDERED: NOVEMBER 2, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2015-SC-000616-MR

FINAL

DATE 11/27/17 Kim Redmon, DC

TRAVIS JETER                             APPELLANT

V.
         ON APPEAL FROM HARDIN CIRCUIT COURT
         HONORABLE KELLY M. EASTON, JUDGE
                NO. 15-CR-00041

COMMONWEALTH OF KENTUCKY                APPELLEE

### OPINION OF THE COURT BY JUSTICE HUGHES

### <u>AFFIRMING</u>

Travis Jeter appeals as a matter of right from a judgment of the Hardin Circuit Court convicting him of robbery in the first degree, first-degree possession of a controlled substance (cocaine), and use of drug paraphernalia. In accord with jury recommendations, the trial court sentenced Jeter as a first-degree persistent felon to respective prison terms of life, three years, and twelve months, with these sentences to be served concurrently as a matter of law. Jeter contends that he is entitled to a new trial for any of three reasons: (1) the trial court erred by denying Jeter's motion in limine to exclude eyewitness identification testimony; (2) the trial court abused its discretion by denying Jeter's last-minute motion for a continuance; and (3) the trial court abused its discretion by denying Jeter's motion to sever the robbery charge from the drug

and paraphernalia charges. Convinced that Jeter has failed to identify anything warranting the relief he seeks, we affirm the Hardin Circuit Court's judgment.

## RELEVANT FACTS

The Commonwealth's proof at trial included testimony by the robbery victim, Joyce Perry, a sixty-or-so-year-old Elizabethtown resident who, in January 2015, had recently retired from her job at the Towne Mall in Elizabethtown. Perry related that during the evening of January 5 she had gone to the mall to visit with some of her former co-workers. As she was getting into her car in the mall parking lot around 7:30, a man she did not know approached her and asked what time the mall closed. For various reasons the man's question and comments seemed odd to Perry, but she answered his question.

As Perry was climbing into the driver's seat of her car, the man suddenly pushed her toward the passenger seat and squeezed into the car along with her. Eventually, after two or three attempts, he managed to close the door. He told her, "This is a holdup!" and demanded her money and her car keys. He also demanded that Perry climb out of the driver's seat and onto the passenger's side floorboard. When Perry replied that she had no money, the man told her, "I can shoot you! I'll kill you!" and continued to try to force Perry into the passenger seat. Perry testified that the gear lever and the central console made it impossible for her to climb into the passenger side of the car, and so she resisted. She pulled at the man's toboggan-type hat; grabbed his

2

hair, which was styled into loose braids; and also tried to honk the horn. Her resistance prompted the man to start hitting her in the face.

A struggle ensued, with Perry continuing to try to honk the horn and then trying to activate the car's alarm with her key fob. The man struck Perry several more times and eventually succeeded in grabbing her purse. During the struggle Perry managed at one point to open the front, passenger side door, which the man then reclosed, and by pressing the buttons on her key fob she may inadvertently have locked the front, driver's side door, which prompted more blows. She apparently also caused the trunk to open. Finally, the man climbed into the back seat and exited through the rear, driver's side door. Perry waited briefly to be sure that he was gone and then went back into the mall for help.

Near the end of Perry's ordeal, another mall patron, Jean Albrecht, arrived and parked a row behind Perry's car. Albrecht testified that she had exited her vehicle and started walking toward the mall when she saw the trunk of Perry's car swing open and at about the same time saw a man emerge from Perry's car and begin to walk away, toward the Sears end of the mall. She called to the man to let him know about the trunk. He stopped and turned toward her, but before she could say anything the trunk closed, and so she just waved, and the man went on. Albrecht continued into the mall, she testified, where she had been for just a minute or two when Perry came in calling for help.

Someone summoned police and emergency medical services, and Perry was taken to Hardin Memorial Hospital, where she was found to have suffered a broken nose, a broken eye socket, and a chipped tooth. The eye-socket injury was still being treated at the time of trial, more than eight months after the attack. Before she was taken to the hospital, Perry told investigators that she did not get a good look at her attacker but that she remembered an African-American man with long braids under a toboggan hat. She also remembered that he was wearing a plaid, hooded shirt; blue jeans; and white shoes.

Albrecht told investigators at the scene that the man she saw walking away from (what turned out to be) Perry's car, was a tall, young African-American who was wearing a dark toboggan hat and a dark jacket. The investigators did not subsequently ask either Perry or Albrecht to attempt to identify Jeter in person or in a photo array.

Police investigators obtained the mall's security video. The video recording of the incident, portions of which the Commonwealth played several times for the jury, captured a man exiting a dark-colored pickup truck and approaching Perry's vehicle as she is just getting into it. It shows the man forcing his way inside the car and, with some difficulty, closing the door. Over seven minutes, the video shows Perry's passenger door opening, but quickly reclosing; Albrecht's arrival; and eventually a man climbing out the back door of Perry's car. The video depicts the man's brief encounter with Albrecht and then Perry leaving her car to enter the mall.

From the mall video, investigators isolated photos of the perpetrator's pickup truck and had them shown during local news broadcasts. The former owner of the pickup truck – which had been customized – saw it on television and notified the investigators that he had recently sold it to a woman named Karen. "Karen" turned out to be Karen Frazier, the mother of Travis Jeter, with whom Jeter lived at the time. An investigator saw the pickup truck parked at Frazier's home a couple of days after the robbery. An earlier search of Perry's vehicle after the incident had turned up a pair of eyeglasses that did not belong to Perry. Having used the security video to connect the pickup truck to Jeter, the investigators located a recent photo of him, and in the photo he is wearing glasses like those found in Perry's car. These facts led to a search warrant for the pickup truck and for Frazier's house. During the searches, investigators found a man's dark jacket that appeared to be spotted with blood as well as a spoon with cocaine residue and the "crack" pipe that gave rise to Jeter's drug charges.

Investigators submitted the glasses found in Perry's car and the potential blood samples from the jacket found in Jeter's room to the state forensic laboratory for DNA analysis. At trial, analysts testified that DNA from the glasses matched Jeter's DNA at all the sites that could be tested, enough sites to yield an astronomically small chance of choosing an individual with that profile at random from the relevant population. The DNA from Jeter's jacket matched Perry's DNA at all sites, again with an infinitesimal chance of a random match.

Jeter maintained an *alibi*/mistaken-identity defense. Soon after his arrest, Jeter told investigators that he spent much of the day of the robbery at a "crack house" using cocaine and becoming acquainted with a fellow user. He claimed that at the time of the robbery, he did not have his truck, although he declined to say who had it. He told the investigators that, hoping to obtain some money to pay for the cocaine he had already used, to buy more cocaine, and to take his new friend out to dinner, he had had someone drive him to a Save-a-Lot, where he hoped to sell some food stamps. By 9:00 that evening, however, he was reunited with the truck, he admitted, because it was about then that his mother called him and told him to bring it home.

Jeter's counsel argued at trial that Jeter's police statement could be credited because Jeter told the investigators things—that he used cocaine, that he visited a "crack house," that he attempted to sell food stamps—that a person was unlikely to admit were they not true. Defense counsel argued that the Commonwealth's DNA and other evidence suddenly became far less damning given that the person who used Jeter's truck could also have used Jeter's jacket, which he found in the truck. As for Jeter's glasses left behind in Perry's car, they may well have fallen out of the jacket's pocket while it was being worn by that other person.

Jeter maintains that one reason the jury rejected his defense is that Albrecht was allowed to identify Jeter at trial for the first time as the African-American man she saw getting out of Perry's car. Albrecht's in-court identification of him, Jeter claims, runs afoul of the United States Supreme

6

Court's *Neil v. Biggers*, 409 U.S. 188 (1972), line of cases, wherein the Supreme Court has recognized "a due process check on the admission of eyewitness identification." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). The constitutional violation here, Jeter further contends, cannot be deemed harmless beyond a reasonable doubt, and so entitles him to a new trial. We begin our analysis with this contention.

## ANALYSIS

### I. A Witness's Spontaneous In-Court Identification of the Defendant Did Not Implicate *Biggers*.

The Supreme Court has held that under certain circumstances the Due Process Clauses of the United States Constitution bar admission of eyewitness identification evidence. To make that determination, courts have employed a two-pronged test. *Commonwealth v. Parker*, 409 S.W.3d 350, 352 (Ky. 2013) (noting that, "The determination of whether identification testimony violates a defendant's due process rights involves a two-step process.") (citations omitted). The court must determine first whether the identification procedure was unnecessarily suggestive. *Perry*, 565 U.S. at 238-39 ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). If so, the court must then consider the totality of the circumstances—the circumstances both at the time of the witness's initial observations and also at the subsequent identification—to assess the reliability of the identification. The identification evidence is to be excluded on due-process grounds only if "improper police

7

conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Biggers*, 409 U.S. at 201).

The United States Supreme Court developed this test in the context of out-of-court identification procedures, such as police-arranged show-ups, line-ups, and photo arrays. With several lower federal courts expressing concern about the suggestiveness of the in-court identification process itself, those courts have since split on the question of whether the same test applies to identifications elicited for the first time in court. *See, e.g., Lee v. Foster,* 750 F.3d 687 (7th Cir. 2014) (applying the two-part test, but ruling that the particular in-court proceedings were not unnecessarily suggestive), *United States v. Hill,* 967 F.2d 226, 232 (6th Cir. 1992) ("All of the concerns that underlie the *Biggers* analysis, . . . are no less applicable when the identification takes place for the first time at trial."); but *cf. United States v. Domina,* 784 F.2d 1361, 1368 (9th Cir. 1986) (Acknowledging that in-court identifications are inherently suggestive, but asserting that different considerations apply when the initial identification is in court, since then, "[t]he jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification.").

Like the Supreme Court's earlier cases in the *Biggers* line, *Perry* concerned an allegedly suggestive pre-trial identification. What distinguished *Perry* was the fact that the identification was not orchestrated by police investigators. Instead, it occurred spontaneously when the witness, asked by a police officer for a description of the person she had seen breaking into cars,

8

called the investigator over to her kitchen window, and identified Perry, who was standing next to another police officer in the parking lot outside, as the perpetrator. *Perry*, 565 U.S. at 234.

Responding to the defendant's contention that the identification circumstances amounted to an unduly suggestive show-up, the Supreme Court emphasized that the *due-process* check on unnecessarily suggestive identification procedures is not triggered by suggestiveness *per se*. That, the Court explained, would lead to an overly-broad constitutional rule, because "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." 565 U.S. at 244. Suggestiveness as such, the Court noted, and the reliability concerns it raises, are usually matters for jury resolution in a trial governed by the Sixth Amendment and conducted under the rules of evidence. 565 U.S. at 237. Suggestiveness raises due process concerns "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." 565 U.S. at 238-39. In other words, despite the acknowledged fallibility of eyewitness identification evidence,[1] that fallibility "does not, without the taint of improper state conduct, warrant a due

---

[1] Jeter refers us to *Commonwealth v. Crayton*, 21 N.E.3d 157 (Mass. 2014), in which the Supreme Court of Massachusetts joined the Supreme Courts of New Jersey (*State v. Henderson*, 27 A.3d 872 (N.J. 2011)) and Oregon (*State v. Lawson*, 291 P.3d 673 (Ore. 2012)), in articulating state law rules meant to expand upon the federal due process requirements and increase the pre-admission scrutiny paid to eyewitness identification evidence. *See also*, Nicholas A. Kahn-Fogel, *The Promises and Pitfalls of State Eyewitness Identification Reforms*, 104 Ky. L. J. 99 (2015-16) (critically surveying state law attempts—legislative and administrative as well as judicial—to enhance the reliability of eyewitness identification testimony).

process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." 565 U.S. at 245.

In this case, as noted, although both Perry and Albrecht saw the perpetrator at the time of the robbery, neither woman provided investigators with a facial description of that person, or much of a description beyond the typical race-age-and-gender, height-and-build, type-of-clothing description. In fact, Perry told investigators that she did not get a good look at her attacker and would not be able to identify him.

After Jeter's arrest, the investigators did not ask either woman to attempt to identify Jeter through a line-up or a photo array. That lack of pre-trial testing prompted a motion in limine by Jeter asking the trial court to disallow, as incompatible with *Biggers*, *i.e.*, unnecessarily suggestive and unreliable, an in-court identification by either witness.

Relying on *Northington v. Commonwealth*, 459 S.W.3d 404, 410 (Ky. App. 2015), in which a Court of Appeals' panel held that "*Biggers* does not apply to first time identifications made in court," (citing *Russell v. Commonwealth*, 490 S.W.2d 726 (Ky. 1973), and *Thompson v. Commonwealth*, 2004 WL 2624165 (Ky. 2004)), the trial court rejected Jeter's *Biggers* argument and ultimately denied his motion to disallow in-court identifications by the two women. Notwithstanding its invocation of *Northington*, however, the trial court offered the parties a suppression hearing on the identification issue if either of them wished to pursue it. At that point, the Commonwealth represented that it had no intention of asking either Perry or Albrecht to identify Jeter beyond the

10

descriptions of the perpetrator they had given to investigators. Jeter did not pursue the matter.

At trial, as noted above, after Albrecht had introduced herself to the jury, explained what had brought her to the mall that evening, and told the jury that she parked in the lot behind the mall's food court, the following exchange occurred with the prosecutor:

Prosecutor: Was it dark outside? Do you remember?
Albrecht: It was dark, but where we parked was where the streetlight was.
Prosecutor: So there was some lighting?
Albrecht: Yes.
Prosecutor: Okay. Did you get out of your vehicle at some point?
Albrecht: Yes.
Prosecutor: Did you see anything?
Albrecht: As I was getting out of my vehicle, I saw a gentleman getting out of a vehicle kind of in front of me.
Prosecutor: Okay.
Albrecht: And it was this gentleman right here [pointing at Jeter].
Prosecutor: It was that gentleman [indicating Jeter]?
Albrecht: Yes sir.
Prosecutor: Okay. And why did you see . . . Did you notice anything about the car?
Albrecht: I was going to tell him that the trunk was open, and I hollered, "Hey," at him about the time the trunk was closing. And I just waved like this [demonstrating] for him to go on.
Prosecutor: Okay. Did you see anyone else get out of the car?
Albrecht: I did not see anybody else get out of the car until after I was in the mall, when a lady came in and said that she was mugged.
Prosecutor: Okay. Now, before today, have I ever showed you any pictures of the defendant?
Albrecht: No sir.
Prosecutor: Matter of fact, I told you I couldn't, correct?
Albrecht: Yes, sir.
Prosecutor: Has anybody ever showed you any photographs of the defendant?
Albrecht: No.
Prosecutor: Have you ever seen that man [indicating Jeter] any time before today other than that night?
Albrecht: No.

11

Prosecutor: Are you sure this is him?
Albrecht: Yes sir.

Jeter contends that Albrecht's identification of him was not reliable as measured according to *Biggers* and asks us to join the courts that have found *Biggers* applicable to all identifications made for the first time in court. We recently rejected this very argument in *Fairley v. Commonwealth*, ___ S.W.3d ___, 2016-SC-000021 (Ky. Sept. 28, 2017).[2] In any event, *Perry* makes clear that *Biggers* and the other cases in its line do not apply to identifications that are not the product of state action. State action is not involved when, as here, a witness volunteers an otherwise untainted identification for which the prosecutor did not ask.[3] Absent the "taint of improper state action," *Perry* establishes that the jury and the ordinary rules of trial provided Jeter with all the process due him for contesting Albrecht's testimony. Thus, on the asserted due process grounds Jeter is not entitled to relief.

## II. The Trial Court Did Not Abuse its Discretion When it Denied Jeter's Continuance Motion.

Jeter also contends that the trial court abused its discretion by denying his motion for a continuance on the morning of trial. In Jeter's view, the trial court ought to have overlooked Jeter's counsel's noncompliance with the formal

---

[2] *Cf. United States v. Correa-Osorio*, 784 F.3d 11 (1st Cir. 2015) (noting that, beyond its strong suggestion that *Biggers* is not implicated by *every* in-court identification, *Perry*, which did not involve a first-time-in-court identification, did not resolve the split in the federal circuit courts over whether *Biggers* applies—always, sometimes, never—to that situation).

[3] As for the prosecutor's follow-up questions following the spontaneous identification, they do not implicate the state action suggestiveness concerns underlying *Biggers*.

requirements for such a motion and addressed the motion's merits. We disagree, but need not belabor the point, since in our view the motion lacked substance as well as proper form.

Jeter's motion arose in the following context: Following the search of his residence on January 10, 2015, Jeter was arrested and charged with (among other things) the robbery of Perry five days earlier. Counsel was appointed for Jeter the day of his arrest. The Hardin County Grand Jury indicted Jeter on January 29, 2015. Jeter was arraigned on February 3, 2015, and appointed counsel appeared with him at the arraignment. Toward the end of March 2015, the trial court held a pre-trial conference, at which it scheduled trial for September 21, 2015, with a final pre-trial conference on September 15. About a week before the September pre-trial, the public defender who had represented Jeter at his arraignment filed motions on Jeter's behalf to sever the robbery charge from the drug-related charges and to disallow identification testimony by either Perry or Albrecht. At the conclusion of the pre-trial conference, the trial court denied both motions. Three days later, on September 18, 2015, a second attorney from the Elizabethtown Public Defender's Office, Ms. Owens, entered her appearance on behalf of Jeter. On the morning of trial, at a conference just before the commencement of *voir dire*, the trial court reiterated its prior rulings on Jeter's severance and suppression motions. With respect to the latter, the Court referred to *Northington*, as noted above, but expressed its willingness to hold a suppression hearing on the eyewitness identification issue if the parties thought that necessary. At that

13

time, the Commonwealth disavowed any intention to seek an in-court identification from either Perry or Albrecht. As the conference was ready to conclude, Jeter's original counsel, who had been seated with Jeter at the defense table, presented the court with a continuance motion and accompanying affidavit that co-counsel Owens had prepared that morning.

The motion requests the court "to continue this case," and the affidavit refers to the several installments of discovery provided by the Commonwealth, including "phone records subpoenaed by the Commonwealth from AT&T regarding Travis Jeter's phone." The affidavit only identifies an issue regarding Jeter's AT&T records. According to the affidavit, "defense counsel" believes that "GPS information is crucial to its theory," but apparently neither the discovery nor the AT&T employees with whom counsel spoke after receiving the discovery supplied that GPS information. The affidavit concludes with a request for a short continuance and asks that the affidavit be sealed until after the trial so as not to reveal defense strategy.

Confronted with the motion on the verge of trial, the trial court initially rejected out-of-hand the unsupported suggestion that the motion to continue could be considered *ex parte*.[4] At that point, the Commonwealth explained that an uncertified copy of the AT&T discovery had been supplied to the defense by September 9, 2015 (followed shortly by a certified copy); disavowed any intention of introducing GPS evidence; and contended that phone company

_____

[4] Jeter did not challenge the trial court's ruling, and that issue is not now before us.

14

records alone were not sufficient to generate the sort of GPS evidence the defense seemed to have in mind.

Before attempting to divine what defense counsel had in mind, the trial court noted that neither the motion nor the affidavit had been signed so, in effect, they had not been tendered. Accordingly, the court denied the motions. At that point, Jeter's initial counsel was willing to sign the motion and did so, but a few minutes later, at the commencement of *voir dire*, when the court asked Ms. Owens if the defense was ready to proceed and she attempted to renew the motion for continuance, the affidavit remained unsigned. The court therefore reiterated its denial of the motion, and the *voir dire* went forward.

Jeter maintains before us that because attorneys are officers of the court and under a duty of candor, it does not matter if they do not sign their motions and affidavits. We do not, as the Commonwealth does, understand Jeter to be arguing that attorneys are above the law. Rather, his argument appears to be that inasmuch as attorneys are subject to sanction under the Rules of Professional Responsibility for misrepresentations in court, any sanctions under the civil or criminal rules of procedure for the same misrepresentations are redundant and can be discarded with respect to counsel. We emphatically disagree.

As the Commonwealth correctly notes, the law that Jeter would have us jettison begins with Kentucky Rule of Criminal Procedure (RCr) 9.04, which provides for postponements in criminal cases of hearings and trials. Under the rule, the court may grant such a postponement to either party "upon motion

15

and sufficient cause shown." If, as here, it is the defendant who seeks postponement "on account of the absence of evidence," his motion may only be made "upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it."

An "affidavit," according to *Black's Law Dictionary* (9th ed. 2009), is "[a] voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Similarly, Kentucky Rule of Civil Procedure (CR) 43.13(1) defines an affidavit for the purposes of our rules and statutory proceedings as "a written statement or declaration sworn to or affirmed before an officer authorized to take depositions by Rule 28."[5] The rule further provides that "[e]very affidavit shall be subscribed by the affiant; and the certificate of the officer or person before whom it is made shall be written separately, following the signature of the affiant, and shall be proof of the time and manner of the affidavit being made." CR 43.13(2).[6]

Because the affidavit counsel submitted in this case was neither signed by the affiant[7] nor certified by an authorized person, it plainly did not satisfy the formal requirements of a motion under RCr 9.04. Not only did the trial

---

[5] Among the persons so authorized by Rule 28 are "a judge . . . [and] a notary public."

[6] RCr 13.04 makes the civil rules applicable to criminal proceedings "to the extent not superseded by or inconsistent with" the criminal rules.

[7] The lack of a signature made it unclear who the affiant was meant to be. The trial court had the impression that Jeter was the implied affiant. In the court's view, therefore, the affidavit had the additional defect of alleging facts that the affiant could not know. Another possibility is that the "defense attorney" the affidavit refers to is the affiant, but in that case it is unclear which defense attorney was intended.

court not abuse its discretion when it rejected Jeter's motion, given the rule's mandatory language (a defense motion for delay on account of a lack of evidence "may be made only upon affidavit"), it had no alternative but to do so. *Cf. Campbell v. Blankenship,* 308 Ky. 808, 215 S.W.2d 960 (1948) (holding under the Civil Code of Practice that an unsubscribed affidavit is void and thus cannot supply a statutory affidavit requirement); *Shafizadeh v. Shafizadeh,* 444 S.W.3d 437 (Ky. App. 2012) (holding that a "declaration," because neither sworn, subscribed, nor certified, did not meet CR 43.13's definition of an affidavit, and thus could not satisfy a statutory affidavit requirement).

Jeter essentially concedes all this but insists, nevertheless, that the affidavit requirement is superfluous. Judges, after all, are among the persons authorized to certify affidavits, and when defense counsel—an officer of the court—makes representations to the judge, he or she is in effect swearing to the statement. This simplistic approach overlooks important considerations underlying the rule.

The affidavit rule serves to assure the court and the Commonwealth that the continuance rule's substantive requirements—delay only for the sake of material evidence that due diligence could not have obtained sooner—are being respected and are evident from facts that defense counsel is able and willing formally to declare in writing. On this substantive score, even apart from its formal shortcomings, Jeter's affidavit is lacking. Even if the affiant's hopes of bolstering Jeter's *alibi* with GPS evidence were enough to move that evidence from the realm of the speculative to the realm of the material, the affidavit

17

includes nothing to assure the court that the defense's failure to pursue that evidence from Jeter's February 2015 arraignment until a week or so before his September 2015 trial comported with its obligation to prepare diligently.

Moreover, unlike our own decisions which we may revisit if given compelling enough reason to do so, the rules of procedure are not for us to revise merely at will, or at defense counsel's urging. Those rules are not for the trial court to revise (or ignore) either. Under the rules noted above, the trial court did not abuse its discretion by denying Jeter's motion for a continuance, when the motion predicated on absence of evidence was not accompanied by the requisite affidavit.

## III. The Joint Trial of Jeter's Robbery and Drug-Related Charges Was Not Prejudicial.

Finally, Jeter contends that the trial court abused its discretion by refusing to order separate trials of the robbery charge and the charges of drug and drug paraphernalia possession. Because Jeter was in no way prejudiced by the joinder, the trial court's denial of his separate trials motion does not entitle him to relief.

As the parties both note, two or more offenses "may be charged in the same indictment . . . if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." RCr 6.18. A joint trial of such offenses is proper unless "it appears that a defendant or the Commonwealth is or will be prejudiced by [the] joinder." RCr 8.31. Even when the joinder is improper, moreover, the error is reversible only upon a "showing of prejudice to the

18

defendant. . . . This showing of prejudice cannot be based on mere speculation, but must be supported by the record." *Hammond v. Commonwealth,* 366 S.W.3d 425, 429 (Ky. 2012) (citing *Rearick v. Commonwealth,* 858 S.W.2d 185 (Ky. 1993) (other citations and internal quotation marks omitted)). Finally, "[t]he primary test for determining whether joinder constitutes undue prejudice is whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth,* 90 S.W.3d 24, 28 (Ky. 2002) (citing *Price v. Commonwealth,* 31 S.W.3d 885, 889 (Ky. 2000)), and *Rearick,* 858 S.W.2d at 187).

Here, although as Jeter notes, robbery and drug possession are not "of the same or similar character," Jeter was not prejudiced by the joinder of the drug-related offenses with the robbery offense. In light of Jeter's police statement shortly after the robbery wherein he claimed he was at a crack house using cocaine the day of the robbery, Jeter's drug use was an inevitable part of the robbery trial. Indeed, drug use was central to his consistent *alibi* that he was first at a crack house and then later that day was attempting to sell food stamps to raise money to buy cocaine and treat a new drug-using friend to dinner. Evidence of Jeter's cocaine and paraphernalia possession would also have been admissible at a separate robbery trial as evidence of Jeter's motive for the robbery. *See* KRE (Kentucky Rule of Evidence) 404(b)(1) (noting that evidence of collateral crimes may be admissible if offered for some non-character purpose such as "proof of motive"). Again, Jeter admitted that

19

at the time of the robbery he was in need of cash to buy cocaine and dinner to share with his new female friend. The evidence of Jeter's drug-related offenses was relevant to that admission, and the jury was free to believe that part of Jeter's statement, and yet doubt his claim that he raised money not by robbing Perry, but by trying to sell food stamps.

Regardless of whether the joinder of the robbery and drug charges was technically correct under RCr 6.18, there was no prejudice. Jeter's own drug-use *alibi* undercut any claim to the contrary.

## CONCLUSION

In sum, Jeter's claims do not establish a right to relief. Under the United States Supreme Court's decision in *Perry*, Jean Albrecht's unrequested-for in-court identification of Jeter did not implicate the Due Process concerns of *Biggers* and related cases because it was not the product of state action, much less any unnecessary or improper state action. The trial court properly denied Jeter's last-minute request for a continuance because, among other reasons, Jeter's motion did not comply with RCr 9.04's affidavit requirement. The joinder of the robbery and drug offenses, even if technically questionable, did not result in any prejudice to Jeter. Accordingly, we hereby affirm the judgment of the Hardin Circuit Court.

All sitting. All concur.

20

COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General