RENDERED: MARCH 22, 2018
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

DATE 6/1/18 Kim Redmon, DC

2016-SC-000333-MR

MICHAEL FOWLER                                        APPELLANT

ON APPEAL FROM BUTLER CIRCUIT COURT
V.            HONORABLE RONNIE C. DORTCH, JUDGE
NOS. 15-CR-00011 AND 15-CR-00119

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Michael Fowler appeals as a matter of right from a judgment of the Butler Circuit Court convicting him of first-degree rape, first-degree sodomy (three counts), and first-degree sexual abuse (five counts). Ky. Const. § 110(2)(b). Fowler alleges three errors by the trial court: 1) refusing to grant his motion to sever charges; 2) denying his motion for directed verdict; and 3) barring the introduction of information about a victim's sexual abuse allegations against someone else. For the following reasons, we affirm the judgment and sentence of the Butler Circuit Court.

## FACTS AND PROCEDURAL HISTORY

In the late spring of 2014, Fowler learned from his biological mother, Judy Bernard, about a drug rehabilitation program—Andrea's Mission—in Morgantown, Kentucky. Fowler, who was addicted to heroin at the time,

traveled to Morgantown to enroll in the program. When Fowler arrived in Morgantown he initially stayed with his mother and ten-year-old sister "Susan,"[1] before moving to the Mission's facility for men in Morgantown.

Fowler left the rehabilitation program in late August or early September of 2014, and at some point toward the end of his time in treatment he was given permission to spend nights at Bernard's apartment. Due to Bernard working a third-shift job, Fowler agreed to stay the nights at her residence to help watch Susan. This arrangement continued for approximately two weeks, until one of Bernard's friends returned to Morgantown and was able to watch Susan overnight.

Also, during his time at Andrea's Mission, Fowler became acquainted with one of the female residents, Nicole Waldecker. According to Waldecker, the two entered the rehabilitation program at about the same time, became acquainted, began dating, and by the end of the program wanted to move in together. In late August, Waldecker moved back into the Morgantown home of her mother, Reva Potts, and step-father, the caretakers during her treatment of her two children: a daughter, "Betty," who was born in September 2008 and who was thus seven years old at the time of trial in March 2016, and a then two-year-old son. After the completion of Waldecker's drug rehabilitation, she, Betty, and her son moved into an apartment. Fowler lived with Waldecker and her children at both the Pottses' residence and the apartment.

---

[1] The names of the minor victims in this Opinion have been replaced with pseudonyms to preserve their privacy.

2

During their cohabitation, Waldecker maintained continuous employment, while Fowler took on a larger portion of the care of the children. With respect to Betty, that meant, on school days, seeing to it that she was up and dressed and ready to go in time for the school bus. Waldecker testified, however, that on weekends and during the busy holiday season in November and December, she sometimes had to work when Betty was off, and on those days, Fowler was essentially alone with the child all morning until Waldecker got home from work at about 1:00 p.m.

Several months into living together, Fowler and Waldecker relapsed and began using drugs together. Later in January 2015, when Betty asked if she could go live with her grandmother, Waldecker believed that Betty was upset because of her drug abuse. After Betty went to stay with her grandmother in mid-January 2015, Waldecker and Fowler had an argument that turned into an altercation. Fowler blackened her eyes and bruised three of her ribs, injury enough to land her briefly in the hospital and Fowler in jail. After Fowler pled guilty to fourth-degree assault and was released from jail, he returned to the home, where he argued with Waldecker and with some of her family members, which resulted in the issuance of a Domestic Violence Order against him barring him from the residence.

Afterwards, Betty returned to live with her mother. When Betty came home, Waldecker asked why she had gone to her grandmother's and why she had returned. During this conversation, Waldecker learned of Fowler's abuse of Betty and she contacted the authorities. Subsequently, Officer James

3

Embry of the Morgantown Police Department conducted a preliminary interview with Betty that day that prompted him to arrange a more extensive interview for her at the Barren River Child Advocacy Center (CAC) in Bowling Green. However, before that interview could be held, Officer Embry was contacted by Bernard. She explained that she had learned of Betty's accusations against Fowler and remembering that Fowler had spent nights alone with Susan, had become concerned. When Susan did not completely allay her concerns, she contacted Officer Embry. Afterwards, Officer Embry interviewed Susan and thereafter had charge of both cases.

After Betty was interviewed at CAC, Officer Embry prepared the case for presentation to the Butler County grand jury. In February 2015, the Butler County grand jury charged Fowler with ten counts each of first-degree rape, first-degree sodomy, and first-degree sexual abuse against Betty. In the same indictment, the grand jury also charged Fowler with having sexually abused Susan.[2] The cases involving each girl proceeded together, with a presumption, it appears, that they would be jointly tried. However, on the morning trial was to begin, March 10, 2016, Fowler moved to sever them.[3] The trial court denied that motion, and both girls testified during the Commonwealth's conjoined cases-in-chief.

---

[2] On October 9, 2015, the grand jury issued a superseding indictment that added a persistent felony offender charge, but that charge was later dismissed.

[3] Fowler was indicted by the Butler County grand jury on February 10, 2015. Fowler filed his motion to sever on March 10, 2016, which was the same day his trial began.

4

After a few questions addressing her competence, seven-year-old Betty testified that during the period she, her mother, her baby brother, and Fowler lived together in the Morgantown apartment, Fowler performed a number of acts of a sexual nature on her and had her perform similar acts on him. Although Betty did not have an adult vocabulary for what she was describing, with the help of some leading questions by the prosecutor, Betty stated in effect that Fowler subjected her to incidents of vaginal intercourse, vaginal touching (Fowler placing his penis on the outside of Betty's vagina), and vaginal/oral sodomy. She also testified to occasions when Fowler placed his penis in her mouth, occasions when he had her touch his penis with her hands, and occasions when he kissed her on the mouth. Betty's responses to questions concerning sexual contact with her "bottom" were noticeably less definite than many of her other responses, but they could have been understood as alleging acts of anal sodomy as well.

These episodes "usually" occurred, Betty testified, when her mother was at work, but happened also, she said, while her mother was sleeping and once while her mother was in the shower. In an attempt to differentiate some of the episodes, the prosecutor asked Betty to specify what Fowler had done to her or had her do to him in each room of the residence—her bedroom, her mother's bedroom, the living room, and the bathroom. With the exception of her own bedroom, where Betty recalled only Fowler's kissing her, Betty identified every room as the scene of multiple episodes of sexual behavior, intercourse and/or sodomy and/or genital touching.

5

On the basis of Betty's room-by-room descriptions, the jury instructions asked the jury whether it believed, beyond a reasonable doubt, that Fowler had subjected Betty to vaginal intercourse inside the apartment (the precise room was not identified); that in the living room he had subjected her to penile/oral sodomy, vaginal touching abuse, and penile touching abuse; that in her mother's bedroom he had subjected her to penile/oral sodomy and penile touching abuse; and that in the bathroom he had subjected her to penile/oral sodomy, vaginal touching abuse, and penile touching abuse.

With regard to Betty's allegations against Fowler, the jury was presented with instructions for the following charges: first-degree rape, first-degree sodomy (six counts), and first-degree sexual abuse (five counts). Subsequently, the jury found Fowler guilty of first-degree rape, first-degree sodomy (three counts), and first-degree sexual abuse (five counts). The jury returned not guilty verdicts with respect to three other instructions asking whether it was convinced that Fowler had committed an act of anal sodomy in the bathroom and two such acts in the mother's bedroom.

Susan, Fowler's sister, who was eleven years old at the time of the alleged offense and twelve at the time of trial, also testified. At odds with her mother's testimony, she recalled only a single night during the summer of 2014 when Fowler stayed with her while her mother worked. According to Susan, one night she and Fowler went to sleep in her mother's bedroom. Later that evening, she awoke to Fowler reaching a hand inside her pajamas and inside her underwear and touching the outside of her vagina. Neither she nor Fowler

6

said anything, but she immediately pushed his hand away, left the bed, and slept on the living room couch. The sole jury instruction with respect to Susan asked whether the jury believed beyond a reasonable doubt that Fowler had subjected her to first-degree sexual abuse for touching her vagina. The jury's response was a verdict of not guilty.

As to penalty, the jury recommended a sentence of twenty-five years for first-degree rape and for each of the three first-degree sodomy offenses and terms of seven years for each of the five first-degree sexual abuse offenses. Further, the jury recommended that the terms run concurrently for a maximum term of imprisonment of twenty-five years. The trial court sentenced Fowler in conformance with the recommendation. Fowler now appeals as a matter of right.

## ANALYSIS

### I. The Trial Court Did Not Abuse Its Discretion in Denying Fowler's Motion for Severance.

Fowler contends that the trial court erred by denying his motion to sever the charge of first-degree sexual abuse against Susan from the other counts of rape, sodomy, and sexual abuse set forth in the indictment. [4] Of the thirty-one sexual crimes Fowler was charged with under the indictment, all but one was alleged to have been committed against Betty. The day of trial, Fowler filed a motion for separate trials claiming that he would be prejudiced by a joinder of

---

[4] Fowler argues that the trial court's decision to exclude this evidence violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Sections Two, Three, and Eleven of the Kentucky Constitution.

the charges involving Susan and Betty and requesting that the charges against Susan be tried separately.

The trial court denied Fowler's motion off the record prior to trial but took a break early in the proceedings to permit Fowler the opportunity to detail his arguments for appellate review. Citing Kentucky Rule of Criminal Procedure (RCr) 8.31, Fowler argued that the alleged sexual abuse of Susan, which involved touching, was not strikingly similar enough to the alleged rape and sodomy of Betty. Fowler also noted that there was a five-year age gap between the juvenile victims when the crimes allegedly occurred.

The Commonwealth responded by disagreeing with Fowler's contention that the crimes were not strikingly similar. The Commonwealth noted that both crimes involved juvenile female victims, who were in a familial relationship with Fowler. Also, the Commonwealth stated that the abuse allegedly occurred while Fowler was left to watch the children alone by their mothers and transpired during the same time period—the summer and fall of 2014. Additionally, the Commonwealth explained that Susan came forward to report Fowler's abuse due to her mother's learning about Betty's claims.

RCr 6.18 authorizes the joinder of offenses in separate counts of an indictment on the condition that the offenses are of "the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." Yet, RCr 8.31 limits the ability to join charges requiring that the trial court "order separate trials of counts . . . or provide whatever other relief justice requires" if either the

8

defendant or the Commonwealth is prejudiced by joinder. In this context prejudice has been defined as that which is "unnecessarily or unreasonably hurtful." *Romans v. Commonwealth*, 547 S.W.2d 128, 131 (Ky. 1977). However, "[t]his showing of prejudice cannot be based on mere speculation, but must be supported by the record." *Jeter v. Commonwealth*, 531 S.W.3d 488, 498 (Ky. 2017) (*quoting Hammond v. Commonwealth*, 366 S.W.3d 425, 429 (Ky. 2012)).

Accordingly, "RCr 6.18 and 8.31, thus seek to strike a balance between the prejudice inherent to joining separate charges in a single trial and the interests of judicial economy." *Smith v. Commonwealth*, 520 S.W.3d 340, 353 (Ky. 2017) (*citing Murray v. Commonwealth*, 399 S.W.3d 398, 405 (Ky. 2013)). We review the trial court's decision to join or sever separate counts of an indictment under an abuse of discretion standard. *Hedgepath v. Commonwealth*, 441 S.W.3d 119, 131 (Ky. 2014) (*citing Hammond,* 366 S.W.3d at 429). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Daugherty v. Commonwealth*, 467 S.W.3d 222, 231 (Ky. 2015) (*quoting Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)). However, "[e]ven if the failure to sever counts was in error, 'an erroneous severance ruling does not justify appellate relief unless it resulted in actual prejudice to the party opposing the ruling.'" *Smith,* 520 S.W.3d at 353 (*quoting Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky. 2013)).

9

We disagree with Fowler's contention that the trial court abused its discretion by permitting the charge involving Susan to be tried with those offenses involving Betty. While the offenses Fowler committed against Susan and Betty were not identical, the circumstances of Fowler's crimes reflect a similar character. Fowler was able to prey upon Susan and Betty by abusing the trust granted to him by the victims' mothers when they asked him to serve as caregiver. Despite a five-year age difference between the two victims, they were both young girls whose vulnerability and accessibility Fowler chose to exploit. Also, while Fowler's sexual crimes against Susan and Betty did not occur contemporaneously with each other, the entirety of his criminal activity occurred in the summer and fall of 2014. Further, beyond the factual similarity of the crimes against Betty and Susan, the cases were logically linked as the revelation of the abuse against Betty resulted in the disclosure of the abuse against Susan. Additionally, the manner by which Fowler selected and obtained access to his victims could be considered together as "parts of a common scheme or plan." *See, e.g., Elam v. Commonwealth,* 500 S.W.3d 818, 824-25 (Ky. 2016) (Father/step-father's sexual abuse of his daughter and step-daughter could be viewed as a "continuing scheme to obtain sexual gratification by engaging in sexual acts with easily accessible and vulnerable victims: little girls who depended upon him and regularly stayed at his home.").

10

As such, we cannot say that the trial court abused its discretion in denying Fowler's motion to sever.[5]

## II. The Trial Court Properly Excluded Evidence Under the Rape Shield Rule, Kentucky Rule of Evidence (KRE) 412.

Fowler argues that the trial court erred by preventing him from questioning Betty about an unrelated allegation of prior sexual abuse.[6] While Fowler was awaiting trial in the case at bar, Betty informed the authorities about an unrelated instance of sexual abuse. That instance of sexual abuse occurred approximately one year before Fowler's sexual abuse of Betty. Fowler sought to introduce information about this unrelated claim of abuse arguing that it would provide an alternate source for the injuries caused by his alleged abuse of Betty. Specifically, Fowler opined that Betty's injuries—bleeding and itching—would be established by the medical reports and the testimony of Dr. Blackerby, and he should be able to establish these injuries resulted from the earlier abuse.

In response, the Commonwealth disputed that Betty had suffered an injury from the prior abuse, specifically arguing that the medical records did not support such an allegation. Moreover, the Commonwealth explained that,

---

[5] Even if we concluded that the trial court erred by denying the severance motion, it would be difficult to conclude that Fowler had established "actual prejudice." *Peacher*, 391 S.W.3d at 838. The jury acquitted Fowler of the single charge involving Susan and also three of the charges involving Betty, clearly reflecting a careful assessment of the evidence presented.

[6] Fowler contends that the trial court's decision to exclude this evidence violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Eleven of the Kentucky Constitution.

11

in addition to the sexual abuse occurring a year before Fowler's conduct, the two incidents were factually dissimilar. Specifically, the Commonwealth stated that in the other alleged instance of abuse, the perpetrator used Betty's foot to touch his genitals and that he touched her genitals without causing her injury. After hearing argument, the trial court denied Fowler's motion. The trial court noted that the exceptions to the rape shield law were strict and that the circumstances of the case at bar did not warrant the admission of this evidence.

On appeal, Fowler argues that the trial court erred by concluding that information about the other instance of Betty's abuse was barred by KRE 412. Fowler claims that KRE 412 does not apply in the case at bar "because the evidence was not offered to prove that the alleged victim engaged in other sexual behavior, and it was not offered to prove her sexual predisposition." However, Fowler contends that even if KRE 412 did apply, that information about Betty's prior abuse should have been admissible under KRE 412(b)(1)(A) as it was being offered to prove that another perpetrator was responsible for her injury.[7]

---

[7] Fowler also raises two arguments on appeal, that were not presented to the trial court, to argue that the information about Betty's prior abuse would have been admissible under KRE 412(b)(1)(C) as it went to his claim that 1) Betty made her allegations against him in response to emotional injuries caused by the other instance of abuse and 2) Betty learned how to make such detailed allegations against him due to her previous abuse. It is a long-standing rule of appellate practice that a party "may only present those issues that were fully presented to the trial court and, further, may not bring forward new legal grounds on appeal to challenge those errors." *Commonwealth v. Guernsey*, 501 S.W.3d 884, 893 (Ky. 2016) (*quoting Henderson v. Commonwealth*, 438 S.W.3d 335, 343 (Ky. 2014)). Accordingly, these arguments will not be considered by this Court.

12

Consideration of whether the prior sexual conduct of the victim is admissible in a criminal proceeding will inevitably require analysis to see if that potential evidence is barred by KRE 412(a). The purpose of KRE 412, commonly known as the "rape shield rule," is "to avoid inferences of bad sexual character being used to cast doubt on an alleged victim's claim of sexual assault, which is improper impeachment." *Perry v. Commonwealth*, 390 S.W.3d 122 (Ky. 2012). Furthermore, "[rape shield rules] also enhance the fairness of trials by excluding irrelevant character evidence highly apt to distract and confuse the jury." *Dennis v. Commonwealth*, 306 S.W.3d 466, 475 (Ky. 2010). As such, KRE 412 explicitly prohibits "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior[,]" or "[e]vidence offered to prove any alleged victim's sexual predisposition."

Yet, this general prohibition is subject in a criminal case to three exceptions contained in KRE 412(b)(1): A. To prove that a person other than the accused was the source of semen, injury, or other physical evidence; B. To prove consent, if the evidence involves instances of sexual behavior by the alleged victim with the person accused of the sexual misconduct; C. If the evidence pertains directly to the offense charged. *Minter v. Commonwealth*, 415 S.W.3d 614 (Ky. 2013). However, the exceptions enumerated in "KRE 412(b) [are] to be used sparingly and carefully." *Violett v. Commonwealth*, 907 S.W.2d 773, 776 (Ky. 1995). Moreover, even if the proffered evidence fits one of the exceptions identified in KRE 412(b), this evidence is still "subject to the KRE 403 balancing test, which permits the exclusion of otherwise admissible

13

evidence 'if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.'" *Dennis*, 306 S.W.3d at 472. We review a trial court's decision to admit or exclude evidence under KRE 412 under an abuse of discretion standard. *Commonwealth v. Dunn*, 899 S.W.2d 492, 493 (Ky. 1995).

Despite Fowler's arguments to the contrary, KRE 412(a) applies to Betty's allegations of sexual abuse against a third party. Clearly, Fowler sought to introduce this information to demonstrate that Betty had previously "engaged in other sexual behavior," so as to provide him with an explanation for Betty's allegation of abuse. As such, admission of Betty's allegation of sexual abuse against a third party would only be admissible if Fowler can show that it falls under an exemption identified in KRE 412(b) and warrants introduction under the KRE 403 balancing test. However, Fowler is unable to meet these requirements due to his belief in the veracity of Betty's previous allegation of sexual abuse. Kentucky courts have uniformly concluded that a truthful allegation of unrelated abuse is clearly inadmissible or lacking in probative value. *See Perry*, 390 S.W.3d at 129 ("If the victim is telling the truth about the prior incident, evidence of the prior (true) accusation would have little or no probative value. And the victim would suffer the embarrassment and distress of being questioned about his or her prior victimization."); *Hall v. Commonwealth*, 956 S.W.2d 224, 227 (Ky. App. 1997) ("If the unrelated

14

accusations are true, or reasonably true, then evidence of such is clearly inadmissible primarily because of its irrelevance to the instant proceeding.").

Moreover, even if there were not a bar on the admission of a truthful allegation of prior sexual abuse, Fowler fails to demonstrate that this information would be admissible under KRE 412(b)(1) to establish that an alternate perpetrator was the "source of semen, injury, or other physical evidence." Notably in the case at bar, the Commonwealth did not employ physical evidence to corroborate Betty's allegations, and as such the exception in KRE 412(b)(1) did not apply. *See Montgomery v. Commonwealth*, 320 S.W.3d 28, 40 (Ky. 2010) (KRE 412(b)(1)(A) did not apply where the Commonwealth did not rely on semen, injury, or other physical evidence to substantiate victim's allegations.). Moreover, Fowler's theory of the case was that Betty had not suffered an injury as the allegations against him were a fiction devised by her mother. In his opening statement, Fowler emphasized the lack of physical proof to establish that the abuse had occurred. Further, during Fowler's cross-examination of Dr. Blackerby, he inquired about whether any physical injuries were visible during Betty's medical examination. Dr. Blackerby noted that Betty did not have any visible anatomic change from trauma, that her hymen was intact, and that there had not been any anal or vaginal tearing or scarring. Accordingly, due to Fowler's questioning, it was well established at trial that Betty had not suffered a visible anatomic injury from his abuse. As such, Fowler would have not been able to use KRE 412(b)(1)(A) to introduce information about Betty's prior abuse to explain a non-existent injury.

15

Nor was information about Betty's prior abuse warranted to explain "other physical evidence." Fowler explicitly based his motion on his belief that the medical reports and Dr. Blackerby's testimony would reveal that Betty suffered from bleeding and itching after her sexual assault. No medical records were admitted at trial and Dr. Blackerby did not testify that Betty was suffering from bleeding or itching when he examined her. Dr. Blackerby did testify that Betty had told him that she had bled after her sexual assault. However, when questioned by Fowler, Betty explicitly denied suffering from bleeding or itching. It is obvious that Betty's prior claim of sexual abuse, which was not alleged to involve penetration or injury, and which occurred a year before Fowler's assault, had no connection to the case at bar. Therefore, as there was no connection between Betty's prior sexual assault and the charges against Fowler, the trial court properly excluded evidence of the prior sexual assault.[8]

## III. The Trial Court Did Not Abuse Its Discretion in Denying Fowler's Motion for Directed Verdict.

Fowler's final argument is that the trial court abused its discretion in denying his motion for directed verdict. [9] [10] However, prior to addressing the

---

[8] We also reject Fowler's contention that the trial court's exclusion of evidence under KRE 412 denied him his constitutional right to confront witnesses and present a complete defense. It is clear that the trial court's application of KRE 412 was not "'arbitrary or disproportionate' to the 'State's legitimate interests.'" *Montgomery*, 320 S.W.3d at 42. While the evidence that Fowler sought to admit was at best of slight probative value, its likelihood to confuse the jury and embarrass the victim unnecessarily was substantial.

[9] Fowler argues that the trial court's decision to deny his motion for directed verdict violated his rights under the Fourteenth Amendment to the United States Constitution and Sections Two and Eleven of the Kentucky Constitution.

[10] Fowler alleges that the trial court erred by denying his motion for directed verdict on all counts in the indictment but given the fact that the jury acquitted Fowler

16

merits of Fowler's argument, we note that his claim is unpreserved. At the close of the Commonwealth's case-in-chief, Fowler made a motion for directed verdict saying "[y]our honor at this time I would move for a directed verdict on behalf of Mr. Fowler. I state that the Commonwealth has failed to establish its burden of proof on the charge of rape first, sodomy first, and sexual abuse first, your honor." Subsequently, the trial court denied Fowler's motion saying:

> I think we've got enough evidence for at least some of the counts to go to the jury. I'm not sure that we have sufficient evidence, I haven't counted them from my notes, as to all of the counts to go to the jury. So I will entertain the motion for directed verdict on some of those counts at the end of the case. So I'm reserving ruling on that, how many counts are going to go to the jury.

Later, Fowler renewed his motion for directed verdict by stating, "[y]our honor, at this time we would ask the court for a motion on a directed verdict charge. We feel the Commonwealth has not met its burden and we ask for a directed verdict on all counts your honor." The trial court once again denied the motion explaining,

> [b]y my way of thinking the evidence that was presented to the jury [the victims] both testified with regard to various sexual offenses allegedly committed by Mr. Fowler. Mr. Fowler, the defendant, took the stand and said he didn't. Classic jury question for the jury to decide whether he is guilty or not guilty of those offenses."

Kentucky Rule of Civil Procedure (CR) 50.01 states, in pertinent part "[a] motion for a directed verdict shall state the specific grounds therefor." "We have previously applied CR 50.01 to criminal cases and have held that its

---

of the alleged offense against Susan, this moots his contention that he was entitled to a directed verdict in that case. We shall focus our analysis, therefore, as Fowler does on the case involving Betty.

17

requirement of 'specific grounds' must be followed to preserve for appellate review a denial of a motion for a directed verdict of acquittal." *Jones v. Commonwealth*, 331 S.W.3d 249, 252 (Ky. 2011) (*quoting Potts v. Commonwealth*, 172 S.W.3d 345, 348 (Ky.2005)). As this Court has explained, "insufficiently specific motions for directed verdict do not preserve sufficiency of the evidence challenges for appeal and that in such cases the appropriate standard of review is not the 'any rational juror' standard from *Benham* but the palpable error standard of RCr 10.26."[11] *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011) (*citing Johnson v. Commonwealth*, 292 S.W.3d 889 (Ky. 2009); *Potts,* 172 S.W.3d at 345).

Fowler's directed verdict motions were inadequate, as they only featured a general claim that the Commonwealth had presented insufficient evidence to meet its burden of proof. As such, Fowler's motions did not comport with CR 50.01's specificity requirement and are not properly preserved for appeal. Fowler's claims are therefore reviewed under the palpable error standard of RCr 10.26. As for the merits of Fowler's claim, whether the trial court should have granted a motion for directed verdict, we review the evidence in the light most favorable to the Commonwealth. *See Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

---

[11] "The palpable error rule requires reversal when 'manifest injustice has resulted from the error.'" *Fairley v. Commonwealth*, 527 S.W.3d 792, 801 (Ky. 2017) (*quoting Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012)). In assessing whether there has been a showing of manifest injustice, the Court focuses "on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* (*quoting Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006)).

Fowler's principal contention is that Betty's testimony was contradictory and otherwise unreliable so that the Commonwealth was unable to meet its burden of proof for the charges of first-degree rape, first-degree sodomy, and first-degree sexual abuse.[12]  Moreover, Fowler professes that Betty's testimony was so devoid of value that "there was no evidence that Mr. Fowler committed any sexual acts against either [victim].  This conviction was clearly based on something other than evidence, like suspicion, conjecture and pure emotion."  However, we reject this argument, as Betty's testimony was sufficient for the Commonwealth to meet its burden of proof for the charges against Fowler to be presented to the jury.

With respect to clarity, at the opening of Betty's direct examination, the then seven-year-old girl told the prosecutor that Fowler had done "wrong" things to her, that he had put his "private spots" where he was not supposed to put them.  With the help of gestures and with the help of the prosecutor, Betty explained that by "private spots" (sometimes she said "bad spots" as an alternative) she meant the areas down below the waist and "between the legs."  A rational juror might thus have understood her testimony that Fowler placed his "private spot" sometimes upon and sometimes partially inside her "private spot" ("It kind of hurt.") as referring to vaginal touching and to intercourse; her

---

[12] Fowler also contends that Betty's statements to Dr. Blackerby were the product of coaching.  Fowler fails to provide any evidence to conclusively establish this claim, rather relying on inconsistencies in Betty's testimony while not taking into consideration the inherent difficulties and pressures a minor child is subjected to in testifying during an adversarial proceeding.

19

testimony that Fowler had her ("He told me to.") place her mouth on his "private spot" as referring to oral/penile sodomy; her testimony that Fowler placed his mouth on her "private spot" as referring to oral/vaginal sodomy; and her testimony that Fowler had her place her hands on his "private spot" as referring to penile touching abuse.

We do not at all disagree with Fowler's observation that seven-year-old Betty's testimony was not as clear as an adult's testimony might have been. The child struggled with a limited vocabulary, and she was plainly discomfited at having to testify at all, not to mention having to testify about such difficult matters. We do disagree, however, with the contention that the child's testimony was so unclear that it should have been discounted.

It is a long-standing principle that "the unsupported testimony of the [victim], if not contradictory or incredible, or inherently improbable, may be sufficient to sustain a conviction of rape." *Robinson v. Commonwealth*, 459 S.W.2d 147, 150 (Ky. 1970). *See also, Garrett v. Commonwealth*, 48 S.W.3d 6, 10 (Ky. 2001) (noting that "[c]orroboration in a child sexual abuse case is required only if the unsupported testimony of the victim is '. . . contradictory, or incredible, or inherently improbable.'"). Regrettably, testimony such as Betty's is rarely incredible or inherently improbable, and Betty's testimony was neither. Furthermore, while Betty's testimony was not entirely consistent or completely free of ambiguity, any lapses were not so pervasive as to obscure or obliterate what a rational juror could believe to be its central core of meaning. As Betty's testimony was sufficient to have the charges against Fowler

20

presented to the jury, the trial court properly denied his motion for directed verdict.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the Butler Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Roy Alyette Durham II
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jesse Robbins
Assistant Attorney General
Office of Criminal Appeals
Office of Attorney General